185 P.3d 594 (2008)
PIERCE COUNTY, a political subdivision of the State of Washington; Pierce County Regional Support Network, a division of Pierce County Department of Human Services; and Puget Sound Behavioral Health, a psychiatric facility owned by Pierce County Regional Support Network; Washington Protection and Advocacy System, Inc., Respondents/Cross-Appellants,
v.
STATE of Washington; and State of Washington, Department of Social and Health Services; Maryanne Lindeblad, in her official acting capacity as Director of Mental Health Division; and Andrew Phillips, in his official capacity as Chief Executive Officer of Western State Hospital, Appellants/Cross Respondents.
No. 34423-8-II.
Court of Appeals of Washington, Division 2.
May 28, 2008.
*601 Deborah A. Dorfman, New York City Law Department, New York, NY, David B. Girard, Attorney at Law, Stacie Berger Siebrecht, Disability Rights Washington, Seattle, WA, for Defendant.
Carrie L. Bashaw, Attorney General's Office, William Lee Williams, Attorney at Law, Eric Nelson, Attorney General of Washington, Olympia, WA, for Appellant/Cross-Respondent.
Sanford E. Pitler, Michael F. Madden, Marie Renee Westermeier, Bennett Bigelow & Leedom PS, Linda O'neil Coleman, Quorum Review, Inc., Seattle, WA, for Respondent/Cross-Appellant.
ARMSTRONG, J.
ś 1 Pierce County contracted with the State to provide short-term mental health care services to county residents. The contracts required the County not to exceed the number of hospital beds at Western State Hospital allocated to it under former WAC XXX-XXX-XXXX (2005), and to pay liquidated damages if it exceeded its allocation at a time when the number of patients at the hospital exceeded its overall funded capacity. When the County exceeded its bed allocation, the State began "wait-listing" long-term patients for admission to the hospital and assessing liquidated damages against the County. The State also refused to continue providing short-term evaluation and treatment services to county residents at the hospital. The County initiated this lawsuit, and the State filed counterclaims.
ś 2 The trial court concluded that the State is solely responsible for the care and treatment of long-term public mental health patients under the Involuntary Treatment Act, chapter 71.05 RCW, and it granted the County monetary and injunctive relief. It invalidated former WAC XXX-XXX-XXXX and the contract provisions incorporating it. And it refused to retroactively apply the legislature's 2006 amendments to the Involuntary Treatment Act and the Community Mental Health Services Act, chapter 71.24 RCW. The trial court further concluded that the contracts did not require the County to use Medicaid funds to pay for non-Medicaid services and that the short-term mental health *602 care provided at Western State Hospital did not count toward the County's obligation to provide 85 percent of short-term care within its boundaries.
ś 3 The State appeals the trial court's orders granting the County monetary and injunctive relief. The County cross-appeals the trial court's orders denying the County's Medicare funding and short-term care claims, as well as its refusal to award prejudgment interest.
ś 4 We affirm the trial court's judgment and order awarding monetary damages as well as its dismissal of the Medicaid funding and 85 percent short-term care requirement claims. We reverse the trial court's denial of the motion to vacate the injunction and the denial of prejudgment interest on the liquidated damages claim, but we affirm the denial of prejudgment interest on the long-term care claim. Finally, we grant the State's motion to strike in part and deny sanctions against the County.

FACTS
ś 5 The plaintiffs in this case are Pierce County, Pierce County Regional Support Network, Puget Sound Behavioral Health, and Washington Protection and Advocacy System. Unless otherwise noted, we refer to these groups as the County. The defendants include the State of Washington, Department of Social and Health Services, Mary Anne Lindeblad (as director of the mental health division of the Department of Social and Health Services), and Andrew Phillips (as chief executive officer of Western State Hospital). Unless otherwise noted, we refer to the defendants as the State or the Department.

I. THE PUBLIC MENTAL HEALTH SYSTEM
ś 6 In Washington, the State supports the adult public mental health system in two ways. The Department is designated as the state mental health authority and operates Western State Hospital and Eastern State Hospital. RCW 71.24.035(1); RCW 72.23.020.[1] These inpatient psychiatric facilities are statutorily mandated to handle "the most complicated long-term care needs of patients with a primary diagnosis of mental disorder." RCW 72.23.025(1). The State also provides mental health services through contracts between the Department and county regional support networks. See RCW 71.24.035(5)(e), (15)(b). Entered into under the Community Mental Health Services Act, these contracts transfer funding and responsibility for the mentally ill from the State to the regional support networks to maintain the mentally ill in their communities where possible through the provision of short-term, acute care, and less complicated long-term care. See RCW 71.24.035(15); Former RCW 72.23.025(1) (2004).
ś 7 Washington's 39 counties are divided into 14 regional support networks, which are responsible for crisis response services, hospital admissions, discharge coordination, and follow-up care. The decision to create a regional support network or join with other counties in creating a multi-county network is optional. A county may choose not to contract at all, in which case the Department assumes direct responsibility for all aspects of that county's mental health system. RCW 71.24.035(4), (14). At the time of trial, Western State Hospital was the intensive inpatient state psychiatric facility for 9 regional support networks, including Pierce County Regional Support Network.
ś 8 The regional support networks administer the involuntary commitment process, which begins when someone alleges that a person either poses a risk of serious harm or is gravely disabled as a result of a mental disorder. RCW 71.05.025, .150(1)(a). If a county designated mental health professional[2] employed by the regional support network concludes that the allegations are true and the person will not voluntarily seek treatment, the mental health professional seeks an order from the superior court detaining the person for up to 72 hours of treatment at an evaluation and treatment *603 facility. RCW 71.05.150(1)(a)-(b). Following the 72-hour detention, the superior court can order a person detained for up to 14 additional days of involuntary treatment. RCW 71.05.230, .240. The 72-hour and 14-day timeframes are referred to as short-term care. Evaluation and treatment facilities take only patients who are detained for 72 hours or committed for up to 14 days. RCW 71.05.150(1)(b), .240.
ś 9 At the time of trial, Puget Sound Behavioral Health was the County's evaluation and treatment facility, although Western State Hospital also provided some short-term care.[3] The regional support networks then were responsible for providing at least 85 percent of short-term care needs within their community; they must now provide 90 percent. RCW 71.24.300(6)(c); former RCW 71.24.300(1)(d) (2004).
ś 10 If involuntary care beyond 17 days is required, the professional in charge may petition the superior court for up to 90 days of involuntary treatment. RCW 71.05.290. If the court or a jury determines that the patient meets the criteria for 90 days of involuntary treatment, the court "shall remand him or her to the custody of the department or to a facility certified for ninety day treatment by the department for a further period of intensive treatment." RCW 71.05.320(1). In certain cases, the initial long-term commitment may be 180 days, in which case the commitment must be in a "facility certified for one hundred eighty day treatment by the department." RCW 71.05.320(1)(a)-(b).
ś 11 If further treatment is required, the professional in charge may file a new petition and the court may order the patient to return to the facility for 180 days. RCW 71.05.320(3). The court may order successive 180-day commitments as necessary. RCW 71.05.320(3). The 90-day and 180-day timeframes and subsequent extensions are referred to as long-term care. Western State Hospital is the only facility in western Washington that is legally authorized to accept and treat persons who have been involuntarily committed on a long-term basis, i.e., 90 days or longer. RCW 72.23.020, .025.
ś 12 The Department provides much of the regional support networks' funding through biennial contracts authorized by the Community Mental Health Services Act. RCW 71.24.035(15)(b). Of relevance here are the two contracts that the County entered into between 2001 and 2005.[4] Under these contracts, the State distributed Medicaid funds so that the County could provide services to Medicaid-eligible persons; it also distributed "state-only" funds so that the County could serve non-Medicaid patients as well. These contracts required that the County not exceed the number of hospital beds at Western State Hospital allocated to it under former WAC XXX-XXX-XXXX. If the County did exceed its allocated beds at a time when the number of patients at the hospital exceeded its overall funded capacity, the State deducted liquidated damages from its payments to the County.[5]
ś 13 The Center for Medicare and Medicaid Services is the federal agency that administers the Medicaid program. Under section 1915(b) of the Social Security Act (codified at 42 U.S.C. § 1396n(b)), a state may apply for a waiver of certain Medicaid requirements in order to implement a managed-care delivery system. The contracts at issue here implement the State's section 1915(b) mental health waiver and create a managed-care system. This system is more *604 efficient than a pay-for-service system; providers typically realize "savings" under the State's managed health care system.
ś 14 In 2000, the State began reducing the number of civil commitment beds at Western State Hospital and reallocating the beds among the 9 regional support networks that the hospital serves. As a result, the County began to exceed its allocated bed targets. The State then began "wait-listing" long-term patients for admission to the hospital. By the time this case went to trial, Western State Hospital had denied immediate admission to 427 of the County's long-term committed patients. Their waiting times ranged from 1 to 27 days, during which time they remained at Puget Sound Behavioral Health. The average wait was 2-4 days. The State also began assessing liquidated damages against regional support networks that exceeded their bed targets. The State withheld approximately $1,000,000 from payments to the County as liquidated damages; the County, in turn, withheld the cost of the liquidated damages from the providers it subcontracted with to provide mental health services. The subcontractors reduced the level of services they provided accordingly.
ś 15 The State further decided in 2001 that Western State Hospital would no longer be able to provide short-term evaluation and treatment services to County residents. The State took the position that short-term patient commitments to Western State Hospital, which is in Pierce County, did not count toward the County's obligation to provide 85 percent of evaluation and treatment services to short-term patients within its boundaries.

II. LITIGATION
ś 16 The County initiated this lawsuit in November 2002 and in an amended complaint sought relief under the Administrative Procedure Act and for breach of contract and constitutional provisions. The State filed counterclaims, alleging breach of contract.
ś 17 In 2005, the County filed several motions for partial summary judgment, seeking declaratory relief to: (1) establish that the Department had sole responsibility for caring for longterm patients; (2) challenge the imposition of liquidated damages under the contract and under former WAC XXX-XXX-XXXX; and (3) establish that Western State Hospital is within the boundaries of the Pierce County Regional Support Network and that the County may use the hospital to meet its obligation to provide 85 percent of short-term care within the County's boundaries. The County also sought to dismiss the State's counterclaim alleging breach of contract for failure to meet the 85 percent requirement.
ś 18 The trial court granted the County's first two motions. It ruled that the State had sole responsibility under the Involuntary Treatment Act for long-term patients and that the County had no duty to provide care and treatment to such patients under the applicable law or contracts. It enjoined the State from declining to timely accept long-term patients from the County, and it gave the State 60 days from the date of its written ruling to comply. The trial court also determined that the State must reimburse the County for the cost of caring for wait-listed long-term patients. The trial court further held that the liquidated damages provisions of former WAC XXX-XXX-XXXX and the contracts were not valid, and it ordered the State to repay the sums withheld. The trial court subsequently denied the County's motion for summary judgment on the 85 percent rule but granted the County's motion to dismiss the State's counterclaim alleging that the County violated the contract by failing to meet the 85 percent requirement.
ś 19 After a three-week trial, the trial court denied relief on the County's remaining claims, including its argument that the 2001-03 and 2003-05 contracts were unlawful in requiring the expenditure of Medicaid funds for persons who were not eligible for Medicaid. The trial court fixed the amount of monetary relief due the County under its summary judgment rulings, denying the County's request for prejudgment interest. It also entered final findings of fact and conclusions of law and a final judgment and order that reaffirmed the earlier injunction.
ś 20 Before entry of the final order, the County moved for an order finding the Department in contempt, contending that it was *605 entitled to all 29 of the beds in the new ward that Western State Hospital had opened to comply with the injunctive order and alleging that the hospital was continuing to wait-list the County's long-term patients. The trial court denied that motion but ordered the Department "to do whatever is necessary" to comply with the injunction. Clerk's Papers (CP) at 4445. The trial court also denied the State's motion to vacate or amend the injunction. The State appealed that ruling as well as the trial court's other orders. The legislature then amended several pertinent statutes in chapters 71.05 and 71.24 RCW and eliminated judicial remedies for alleged violations of either enactment. LAWS OF 2006, ch. 333, §§ 101, 103, 301.
ś 21 The State moved a second time to vacate the injunction, contending that the new legislation eliminated the County's ability to seek injunctive relief. The trial court denied this motion, and the State appealed. We consolidated the State's appeals, and the County filed a cross appeal.
ś 22 The issues are whether: (1) the Department is financially responsible for the care of long-term patients immediately after the superior court signs a commitment order; (2) the 2006 legislation applies to the trial court's decision and, if so, whether the legislation is constitutional; (3) the Department could withhold liquidated damages under the parties' contracts or former WAC XXX-XXX-XXXX when the County exceeded its allocated number of beds; (4) the County could include the short-term patients at Western State Hospital in meeting its short-term care requirements; (5) the Department illegally required the County to use Medicaid funds for non-Medicaid patients; and (6) the trial court should have allowed the County prejudgment interest on its damages awards.
ś 23 We hold that the Department is financially responsible for long-term care patients and that the Department wrongfully withheld liquidated damages. We also hold that the 2006 legislation is constitutional and invalidates the trial court's injunctive relief. Further, we hold that the County cannot count Western State Hospital's patients in meeting its 85 percent short-term care requirement and that the Department did not force the County to use Medicaid funds for non-Medicaid patients. Finally, we hold that the County is entitled to prejudgment interest on the withheld liquidated damages award, but not the long-term care damages.

ANALYSIS

I. RESPONSIBILITY FOR LONG-TERM CARE
ś 24 The question is who is responsible for involuntarily detained persons between the trial court ordering a 90-day or 180-day commitment and the person's actual admission to the state hospital, and who bears the cost of waiting patients.[6] After the State imposed that responsibility and cost on the regional support networks, the County sought declaratory and injunctive relief under the Administrative Procedure Act, chapter 34.05 RCW. The trial court granted the County summary judgment on this issue and also granted its request for injunctive relief.
ś 25 The Administrative Procedure Act does not expressly authorize summary judgments, but case law establishes that summary proceedings may be employed. See Eastlake Cmty. Council v. City of Seattle, 64 Wash.App. 273, 276, 823 P.2d 1132 (1992). We review an order granting summary judgment de novo, viewing all facts and reasonable inferences from them in the light most favorable to the nonmoving party. Hisle v. Todd Pac. Shipyards Corp., 151 Wash.2d 853, 860, 93 P.3d 108 (2004).
ś 26 The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). The trial court found the County's claims reviewable under RCW 34.05.570(4). That provision of the Administrative Procedure Act provides that a court may grant relief from agency action that is "[o]utside the statutory authority of the agency or the authority conferred by a provision of law" or *606 "[a]rbitrary or capricious." RCW 34.05.570(4)(c)(ii), (iii).
A. Interpretation of RCW 71.05.320(1)
ś 27 The following findings of fact and conclusions of law from the October 2005 order regarding cross motions for summary judgment on long-term care patients are pertinent to this issue. The State assigns error to each.
I. Findings of Fact
A. The State of Washington, acting through Western State Hospital (WSH), adopted a policy or practice in approximately June 2002 of declining to accept patients committed by the courts to the custody of the Department of Social and Health Services (DSHS) for long term care under RCW 71.05.320, based on conditions at WSH including patient safety, patient census or staffing. This policy or practice has required plaintiff Pierce County, acting through PSBH [Puget Sound Behavioral Health] and Pierce County RSN [Regional Support Network], to care for Pierce County RSN or PSBH 90 to 180 day long term patients who have been committed by the courts to DSHS's custody at WSH, until WSH agrees to accept them or the patient is otherwise discharged.[[7]]
. . . .
II. Conclusions of Law
. . . .
2. The State has the sole responsibility under the Involuntary Treatment Act (ITA) for providing adequate care and individualized treatment to 90 to 180 day long-term patients once a court signs an order committing the patient to the custody of DSHS. Pierce County RSN and PSBH have no duty to provide care and treatment to 90 to 180 day committed patients under RCW Ch. 71.05 or RCW Ch. 71.24, or the contracts entered into by Pierce County RSN and DSHS for the 2001-03 and 2003-05 biennia, except such duties as may exist to individual patients under RCW Ch. 71.24 or other provisions of law until such time as the patient is transferred from PSBH to WSH or another facility identified by DSHS that is able to provide the care needed by the patient.
3. When WSH declines to timely accept Pierce County RSN or PSBH 90 or 180 day long-term patients committed to the custody of DSHS for reasons related to WSH census or staffing and not related to the safety of the patient, and thereby requires that these patients remain at PSBH or under Pierce County RSN's responsibility, DSHS fails to perform a duty required by law and acts outside its statutory authority.
4. Plaintiffs were substantially prejudiced when WSH declined to accept Pierce County RSN or PSBH 90 or 180 day long term patients committed to the custody of DSHS by the courts.
5. The State is financially responsible for unreimbursed costs associated with PSBH or Pierce County RSN providing care to 90 or 180 day long-term committed patients whose custody DSHS has declined to timely accept.
6. This order applies to adult patients at PSBH or under Pierce County RSN's responsibility committed pursuant to Chapter 71.05 RCW.
7. In the event WSH is unable to provide proper medical care or is unable to provide for the patient's safety for reasons other than hospital patient census or staffing, DSHS or WSH shall arrange for the patient's care elsewhere.
CP at 1861-63.
ś 28 The State argues that the Involuntary Treatment Act does not create a legal duty for Western State Hospital to immediately admit long-term patients. The primary statute at issue is RCW 71.05.320(1), and the key question is how to interpret the phrase stating that, once intensive long-term treatment is found necessary for a person, the court "shall remand him or her to the custody of *607 the department or to a facility certified for [long-term] treatment."
ś 29 We review a trial court's interpretation of a statute de novo. State ex rel. Citizens Against Tolls v. Murphy, 151 Wash.2d 226, 242, 88 P.3d 375 (2004). Our objective is to ascertain and carry out the legislature's intent, and if the statute's meaning is plain on its face, we must give effect to that meaning. Murphy, 151 Wash.2d at 242, 88 P.3d 375. Under this plain meaning rule, we look at both the wording of the statute and the wording of related statutes or other provisions of the same act. Murphy, 151 Wash.2d at 242, 88 P.3d 375; Dep't of Ecology v. Campbell & Gwinn, 146 Wash.2d 1, 10-12, 43 P.3d 4 (2002). If the statute remains susceptible to more than one reasonable meaning after such an inquiry, the statute is ambiguous and we resort to various statutory construction aides, including legislative history. Murphy, 151 Wash.2d at 242-43, 88 P.3d 375.
ś 30 The State asserts that no language in RCW 71.05.320(1) requires the admission of long-term patients by a certain time; it contends that we should interpret the statute to allow Western State Hospital to exercise its discretion in timing the admission of patients to ensure a safe environment for all. In a public policy argument that expands the boundaries of the plain meaning rule, the State argues that the trial court's ruling has eliminated the incentives for the County to keep people out of long-term treatment, as illustrated by the increasing numbers of county patients committed to Western State Hospital after the trial court entered its October 2005 order.
ś 31 The County responds that the language in RCW 71.05.320(1) stating that the court "shall remand him or her to the custody of the department" is unambiguously mandatory. It contends that the ordinary definitions of the key statutory terms contemplate an immediate physical transfer of long-term patients to Western State Hospital. See BLACK'S LAW DICTIONARY, at 384, 1293 (6th ed.1990) ("custody" means "[i]mmediate charge and control . . . implying responsibility for the protection and preservation of the thing in custody," and "remand" means "to send back").
ś 32 The County argues further that the mandatory nature of RCW 71.05.320(1) is discussed in In re Detention of W., 70 Wash. App. 279, 852 P.2d 1134 (1993). That case concerned the State's appeal of an order committing a patient for 90-day treatment to Harborview Medical Center, which was not certified for 90-day treatment. In re W., 70 Wash.App. at 281, 852 P.2d 1134. Referring to the phrase from RCW 71.05.320(1) cited above, the State argued that the order was erroneous because the statute by its explicit language does not permit a person committed for 90-day treatment to be remanded to a facility that has not been certified for 90-day treatment. In re W., 70 Wash.App. at 283-84, 852 P.2d 1134. The patient recognized that the statutory language did not authorize the trial court's action but argued that the court had inherent authority to set appropriate limits and conditions on the treatment ordered to protect his constitutional right to adequate treatment. In re W., 70 Wash.App. at 284, 852 P.2d 1134.
ś 33 Division One of this court agreed with the State that the language "the court shall remand" to the Department or a certified facility was mandatory: "`Shall' is mandatory except under very unusual circumstances." In re W., 70 Wash.App. at 284, 852 P.2d 1134 (citing State v. Smith, 117 Wash.2d 263, 271, 814 P.2d 652 (1991)). The court found no standard in the statute to guide an exercise of discretion and held that RCW 71.05.320(1) required remand to either the Department or a facility certified by the Department for 90-day treatment if a court found intensive treatment warranted. In re W., 70 Wash. App. at 284, 852 P.2d 1134.
ś 34 The State argues here that In re W. does not address the timing of a transfer to the state hospital but instead stands for the proposition that the Department has the discretion to choose an appropriate facility for a long-term patient. The State points to no language in either In re W. or the statute guiding such an exercise of discretion, and none is evident. Moreover, even though the State attempts to argue that the "shall" in RCW 71.05.320(1) need not be read as mandatory, *608 it was so interpreted in In re W. and in a more recent discussion of RCW 71.05.320(1). See In re Det. of J.S., 124 Wash.2d 689, 701, 880 P.2d 976 (1994) (referring to "the court shall" in RCW 71.05.320(1) as mandatory language); see also Clark County Sheriff v. Dep't of Soc. & Health Servs., 95 Wash.2d 445, 448, 626 P.2d 6 (1981) ("Presumptively, the use of the word `shall' in a statute is imperative and operates to create a duty rather than to confer discretion.").
ś 35 The County contends that the trial court's interpretation of RCW 71.05.320(1) as conferring a duty rather than discretion on the Department finds support in a case discussing other provisions of the Involuntary Treatment Act. Pierce County Office of Involuntary Commitment v. W. State Hosp., 97 Wash.2d 264, 644 P.2d 131 (1982). At issue was whether Western State Hospital was required to accept patients for evaluation and treatment under RCW 71.05.170 and related statutes when all of its evaluation and treatment beds were full. Pierce County, 97 Wash.2d at 265, 644 P.2d 131. The Supreme Court ultimately determined that the mandatory statutory language required the hospital to accept all petitions and persons presented within its allotted area, even if such acceptance would overtax its facilities. Pierce County, 97 Wash.2d at 272, 644 P.2d 131. In short, the statutory language was binding even if the Department or the hospital faced practical problems in following it: "[M]uch as the courts may sympathize with the institutions which have to bear the frustration and discomforts of overcrowding . . . the problem is one which can be solved only by the Legislature, as it is one of providing for the creation and funding of adequate facilities." Pierce County, 97 Wash.2d at 272, 644 P.2d 131; see also Clark County Sheriff, 95 Wash.2d at 449-50, 626 P.2d 6 (noting Department's inadequate facilities for receiving convicted felons but finding no statutory authority to pass some of its responsibilities on to local authorities).
ś 36 The State urges us to examine other statutes in determining the meaning of RCW 71.05.320(1), arguing that this provision of the Involuntary Treatment Act must be harmonized with provisions of the Community Mental Health Services Act, as RCW 71.05.025 provides. This statute explains that "[t]he legislature intends that the procedures and services authorized in this chapter be integrated with those in chapter 71.24 RCW to the maximum extent necessary to assure a continuum of care to persons who are mentally ill or who have mental disorders." To accomplish this end, the statute requires regional support networks to institute procedures to ensure that a person's history and current treatment are considered before further decisions concerning that person are made. RCW 71.05.025. The statute does not address long-term treatment.
ś 37 The State also notes that the Department has authority to integrate state and county services by promulgating rules and contracting with the regional support networks. RCW 71.24.035(2), (5)(m). With regard to those contracts, RCW 71.24.035 provides that "[n]o contract shall be approved that does not include progress toward meeting the goals of this chapter by taking responsibility for: (i) Short-term commitments; (ii) residential care; and (iii) emergency response systems." RCW 71.24.035(15)(b). The statute makes no reference to taking responsibility for any portion of intensive inpatient long-term care. Furthermore, in describing the regional support networks' duties, former RCW 71.24.300 specified that they shall provide within their boundaries evaluation and treatment services for at least 85 percent of persons detained or committed for periods up to 17 days, plus appropriate residential care for all persons needing evaluation and treatment services for up to 17 days, and added that they shall "[a]dminister and provide for the availability of all other mental health services, which shall include patient counseling, day treatment, consultation, education services, employment services . . ., and mental health services to children." Former RCW 71.24.300(1)(d)-(f) (2004). The statute nowhere specified that the regional support networks are responsible for the care of long-term patients until they gain admission to a state hospital.[8]
*609 ś 38 The State also points to RCW 72.23.025(1), which provides that the state hospitals "shall become clinical centers for handling the most complicated long-term needs of patients with a primary diagnosis of mental disorder." Until 2006, that subsection added that "[o]ver the next six years, their involvement in providing short-term, acute care, and less complicated long-term care shall be diminished in accordance with the revised responsibilities for mental health care under chapter 71.24 RCW." Former RCW 72.23.025(1) (2004). We recognize that Washington law requires the integration of state and county services but agree with the County that requiring long-term patients to be cared for exclusively at state hospitals or certified facilities is consistent with the statutory intent that the state hospitals handle the most complicated long-term needs of patients with mental disorders.
ś 39 Western State Hospital is the only facility in western Washington that is legally authorized to accept and treat persons who have been involuntarily committed on a long-term basis. RCW 72.23.020, .025. The State contends, however, that the hospital's responsibility for accepting long-term patients is not absolute in light of the legislature's intent, to the maximum extent appropriate, to provide treatment in the community. The key word is "appropriate." The Involuntary Treatment Act is intended to "provide prompt evaluation and timely and appropriate treatment of persons with serious mental disorders[,]" and "[t]o encourage, whenever appropriate, that services be provided within the community." RCW 71.05.010(2), (6). We are not persuaded that the legislature meant to include as "appropriate" a process of keeping long-term committed patients at a community facility, not certified to provide the needed care, for either a few days or up to a month in some cases.
ś 40 We acknowledge that the legislature is capable of specifying that a patient's transfer to an appropriate facility must be immediate. RCW 71.05.170 provides that whenever a county designated mental health professional petitions for detention of a person whose actions constitute a likelihood of serious harm, or who is gravely disabled, "the facility providing seventy-two hour evaluation and treatment must immediately accept" the petition and the person on a provisional basis. RCW 71.05.320(1) contains no such language. The County asserts that any ambiguity inherent in this omission is cured by resort to the statute's recent legislative history. The legislature did not add an immediate acceptance requirement when it amended the statute in 2006. By failing to change the wording of the phrase at issue, the County argues, the legislature agreed with the trial court's conclusion that the State is solely responsible for long-term treatment and care, and that its responsibility must be exercised in a timely manner. See Glass v. Stahl Specialty Co., 97 Wash.2d 880, 887, 652 P.2d 948 (1982) (in construing legislation, courts presume legislature is familiar with past judicial interpretations of its enactments). Indeed, the 2006 Legislative Report, which summarizes the action taken to amend chapters 71.05 and 71.24 RCW in response to this litigation, observes that "[t]he state is responsible for treatment services for all long-term intensive inpatient care." FIFTY-NINTH WASH. STATE LEGISLATURE, 2006 FINAL LEGISLATIVE REPORT, 2SSB 6793, at 267.[9] We do not depend on this history, however, to interpret statutory language that we find clear.
ś 41 Courts may not add words or clauses to an unambiguous statute when the legislature has chosen not to include that language. State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003). Requiring the County to assume responsibility for the care and treatment of long-term patients until Western *610 State Hospital decides to admit them reads language into RCW 71.05.320(1) that is not there or in related statutes. As the trial court stated in its oral ruling, "RCW 71.05.320 directs the Court to remand to the State or a facility certified for 90-day treatment, which, in fact, is the State hospital, those patients who need long-term care for 90 or 180 days after a hearing. The Court order is a direction that these patients be cared for by the State. . . ." Report of Proceedings (RP) (Sept. 9, 2005) at 2. The trial court did not err in interpreting the Involuntary Treatment Act to require the State to assume immediate and sole responsibility for the care and cost of patients committed for long-term treatment.
B. Interpretation of the Contracts
ś 42 The State also challenges the trial court's conclusion that the contracts did not require the County to provide interim long-term care. Absent disputed facts, we determine the construction or legal effect of a contract as a matter of law. Yeats v. Estate of Yeats, 90 Wash.2d 201, 204, 580 P.2d 617 (1978). The contracts at issue are for 2001-03 and 2003-05.
ś 43 The County's operations coordinator for contracts stated in her testimony and in a declaration attached to the County's motion for partial summary judgment that the 2001-03 and 2003-05 contracts do not require the County to provide care for long-term patients who are involuntarily committed to Western State Hospital. RP (Nov. 14, 2005) at 7, 10. "The . . . contracts only describe the [Pierce County Regional Support Network's] duty to provide inpatient services in the community for [short-term patients]." CP at 87.
ś 44 A Department official stated in a deposition that the authority for the regional support networks assuming responsibility for long-term patients until their actual admission to Western State Hospital was found in sections 1.1, 2.2, and 2.5 of the 2001-03 contract. Section 1.1 states in part that "[t]he [Mental Health Division] contracts with the Regional Support Network (RSN) to administer the community mental health program as defined in RCW 71.24.025(5), RCW 71.05 or any successors, and, within available resources, to serve eligible consumers." Ex. 6, D0147573. Section 2.2 is a chart that defines the types of services to be made available for various populations, and it lists state hospitals and community hospitals under the heading of "Involuntary Hospitalization." Ex. 6, D0147583. Section 2.5 is headed "Inpatient Services: State Hospitals" and states that "[t]he Contractor shall comply with all applicable law and standards including, but not limited to: RCW 71.24.300 and WAC XXX-XXX-XXXX, or any successors." Ex. 6, D0147587. The official added that the only aspect of the 2003-05 contract that informed the regional support networks of their duties to assume long-term care was its references to chapter 71.24 RCW.
ś 45 On appeal, the State does not cite to this deposition or to the above sections of the 2001-03 contract as support for its interpretation of the contracts. Rather, without identifying the language to which it refers, the State contends that the contract provisions requiring the County to initiate the Involuntary Treatment Act process "unmistakably make it the County's obligation to care for patients until they are actually admitted to the hospital for long-term care, and to absorb the associated costs for waiting patients." Br. of Appellant at 43. Although the State may have intended the contracts to require the County to absorb these costs, this intention is not made manifest in the contracts. The State drafted and presented both biennial contracts to the County. Generally, we construe ambiguous contracts against the drafter. Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 123 Wash.2d 678, 690, 871 P.2d 146 (1994).[10] The County is persuasive in arguing that the contracts' silence on long-term care cannot be taken as implied authority for a unilaterally determined transition period between short-term *611 and long-term care. The trial court did not err in concluding that the contracts do not require the County to pay for a patient's long-term care before he or she is admitted to Western State Hospital.

II. AWARD OF INJUNCTIVE RELIEF
ś 46 At issue here are the following conclusions of law set forth in the October 2005 order regarding cross motions for summary judgment on long-term care patients. The trial court incorporated these conclusions into its final conclusions of law and judgment. The State assigns error to each.

III. Injunction
1. Pursuant to RCW 34.05.574 and RCW 71.05, Defendants are enjoined from declining to timely accept adult patients committed pursuant to Ch. 71.05 RCW for 90 or 180 days who are at PSBH [Puget Sound Behavioral Health] or that PCRSN [Pierce County Regional Support Network] is responsible for at the time of commitment, subject to the conditions set forth below.
a. Timely acceptance means that WSH [Western State Hospital] must accept a 90 or 180 day long-term ITA patient where (i) PSBH or PCRSN notifies WSH that an order of commitment has been entered and that the long term patient is ready for transfer, and (ii) PSBH or PCRSN is able to transport the patient for arrival at WSH at a reasonable time, unless otherwise agreed to by the respective representatives. When PSBH or Pierce County RSN is unable to transport the patient for arrival by a reasonable time on the day of the court order, the patient shall be transported the next day.
b. Where, at the time WSH is notified that an order of commitment has been entered, a patient committed by a court to the custody of DSHS for 90 or 180 days has a medical condition that WSH is unable to provide for, or if there is an issue of patient safety involving factors other than WSH's census that makes it medically inappropriate or unsafe to accept the patient at WSH, WSH or DSHS shall have a reasonable period of time to arrange for the necessary care for the patient elsewhere. The costs to be paid by DSHS regarding any patient that WSH is not able to admit because of medical or safety issues is a matter to be determined at trial.
2. Defendants will not be required to comply with this injunction until December 9, 2005. Between the date of this Order and December 8, 2005, if WSH lacks the ability to admit additional patients and the WSH Medical Director or designee determines that patients other than PSBH or PCRSN patients have a greater need for WSH services or have been on the waiting list longer, the WSH Medical Director or designee shall have the flexibility to determine which patients shall have priority, notwithstanding the foregoing provisions. On and after December 9, 2005, Defendants shall be fully subject to the provisions set forth in paragraph 1. This provision does not relieve DSHS of financial responsibility for the costs of the patient's care.
CP at 1863-64. In February 2006, the trial court denied the County's motion for contempt based on the State's alleged violation of the October order, but it upheld the injunction and ordered the State to do what was necessary to comply with it.
ś 47 The Department contends that the trial court erred in granting injunctive relief because the County had an adequate remedy at law, the trial court failed to consider the public interest, and the injunctive relief infringed on the legislature's appropriation authority. As the following discussion shows, we need not address these issues because of the effect of the 2006 legislation on the trial court's injunctive orders.
A. The 2006 Legislation
ś 48 On June 23, 2006, the State moved to vacate the injunction based on recent legislative amendments to chapters 71.05 and 71.24 *612 RCW. The legislature added new statutes to each chapter which provided as follows:
(1) Except for monetary damage claims which have been reduced to final judgment by a superior court, this section applies to all claims against the state, state agencies, state officials, or state employees that exist on or arise after the effective date of this section.
(2) Except as expressly provided in contracts entered into between the department and the regional support networks after the effective date of this section, the entities identified in subsection (3) of this section shall have no claim for declaratory relief, injunctive relief, judicial review under chapter 34.05 RCW, or civil liability against the state or state agencies for actions or inactions performed pursuant to the administration of this chapter with regard to the following: (a) The allocation or payment of federal or state funds; (b) the use or allocation of state hospital beds; or (c) financial responsibility for the provision of inpatient mental health care.
(3) This section applies to counties, regional support networks, and entities which contract to provide regional support network services and their subcontractors, agents, or employees.
LAWS OF 2006, ch. 333, §§ 103, 301 (codified at RCW 71.05.026 and RCW 71.24.370) (emphasis added). The legislature explained its purpose in enacting these provisions and in amending others as follows:
(1) The legislature finds that ambiguities have been identified regarding the appropriation and allocation of federal and state funds, and the responsibilities of the department of social and health services and the regional support networks with regard to the provision of inpatient mental health services under the community mental health services act, chapter 71.24 RCW, and the involuntary treatment act, chapter 71.05 RCW. The purpose of this 2006 act is to make retroactive, remedial, curative, and technical amendments in order to resolve such ambiguities.
(2) In enacting the community mental health services act, the legislature intended the relationship between the state and the regional support networks to be governed solely by the terms of the regional support network contracts and did not intend these relationships to create statutory causes of action not expressly provided for in the contracts.[[11]] Therefore, the legislature's intent is that, except to the extent expressly provided in contracts entered after the effective date of this section, the department of social and health services and regional support networks shall resolve existing and future disagreements regarding the subject matter identified in sections 103 and 301 of this act through nonjudicial means.
LAWS OF 2006, ch. 333, § 101 (emphasis added). These sections took effect when the bill was filed on March 29, 2006. Laws of 2006, ch. 333, § 404.
ś 49 The trial court denied the State's motion to vacate the injunction on the basis that the County's claim for injunctive relief did not exist on or arise after the effective date of the new legislation. The trial court also concluded that its ruling was not intended to affect the State's allocation of beds but to confirm that long-term patients cannot be left at the County because Puget Sound Behavioral Health is not certified as a long-term care facility. The trial court did not address the retroactivity of the new legislation or its constitutionality.
ś 50 The State argues that the trial court erred because the new legislation clarifies that counties do not have standing to pursue the injunctive relief reflected in the trial court's orders of October 2005 and February 2006.[12] The County responds that it had no *613 "claims" against the State as of March 29, 2006, the effective date of the provisions that eliminated the possibility of injunctive or other judicial relief, and that the legislation thus does not apply to the trial court's orders. See State ex rel. Robinson v. Superior Court for King County, 182 Wash. 277, 279, 46 P.2d 1046 (1935) (interpreting "claim" as synonymous with "cause of action" in construing statutory provision allowing person with claim against State to sue in Thurston County); Safeco Title Ins. Co. v. Gannon, 54 Wash.App. 330, 335, 774 P.2d 30 (1989) (interpreting undefined term "claim" in insurance policy as demand for compensation).
ś 51 We disagree with the County. The 2006 legislation specifically barred claims for injunctive relief based on the allocation or payment of federal or state funds, the use or allocation of state hospital beds, or financial responsibility for providing inpatient mental health care. See RCW 71.05.026(2); RCW 71.24.370(2). We conclude that the 2006 legislation applies to the trial court's injunction because the County's claim for injunctive relief clearly existed as of March 29, 2006, as evidenced by the trial court's August 25, 2006 order denying the motion to vacate the injunction.
ś 52 The parties dispute whether the 2006 legislation is retroactive, but we need not decide that question. When the controlling legislative body changes the law underlying a judgment awarding prospective relief, that relief is no longer enforceable to the extent it is inconsistent with the new law. Miller v. French, 530 U.S. 327, 347, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000). "The provision of prospective relief is subject to the continuing supervisory jurisdiction of the court, and therefore may be altered according to subsequent changes in the law." Miller, 530 U.S. at 347, 120 S.Ct. 2246. Washington law is in accord. See Bedford v. Sugarman, 112 Wash.2d 500, 505, 772 P.2d 486 (1989) (court may modify or vacate an injunction in light of changes in applicable law); see also Agostini v. Felton, 521 U.S. 203, 215, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (court errs when it refuses to modify an injunction in light of changes in law).
ś 53 Moreover, contrary to the County's assertions, the legislature does not violate separation of powers principles by amending the law in response to a trial court ruling, thereby altering the effect of a trial court's injunction. See Miller, 530 U.S. at 347, 120 S.Ct. 2246 (although injunction at issue was final judgment for purposes of appeal, it was not last word of judicial department and could be modified to comply with subsequent changes in the law); Port of Seattle v. Pollution Control Hearings Bd., 151 Wash.2d 568, 627, 90 P.3d 659 (2004) (legislature may clarify a law in response to an administrative adjudication or trial court decision); Marine Power & Equip. Co. v. Human Rights Comm'n Hearing Tribunal, 39 Wash.App. 609, 620, 694 P.2d 697 (1985) (when controlling law changes between the entering of judgment below and consideration of matter on appeal, appellate court should apply new or altered law).
B. Article II. Section 19
ś 54 The County also argues that the 2006 legislation violates both the single-subject and subject-in-title requirements of article II, section 19 of the Washington Constitution, which reads: "No bill shall embrace more than one subject, and that shall be expressed in the title." WASH. CONST. art. II, § 19. Violation of either the single subject or the "expressed in the title" requirement is sufficient to render the relevant bill provisions unconstitutional. Patrice v. Murphy, 136 Wash.2d 845, 852, 966 P.2d 1271 (1998). But we construe article II, section 19 liberally in favor of upholding the legislation. Murphy, 151 Wash.2d at 249, 88 P.3d 375. We presume a statute to be constitutional; a party challenging the statute bears the heavy burden of establishing its unconstitutionality beyond a reasonable doubt. Pierce County v. State, 150 Wash.2d 422, 430, 78 P.3d 640 (2003).
ś 55 The single-subject requirement seeks to prevent grouping of incompatible measures as well as pushing through unpopular legislation by attaching it to popular *614 or necessary legislation. Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 368, 70 P.3d 920 (2003). In analyzing a claimed single-subject violation, we first determine whether the title of the enactment is general or restrictive. City of Burien v. Kiga, 144 Wash.2d 819, 825, 31 P.3d 659 (2001). "A general title is broad, comprehensive, and generic as opposed to a restrictive title that is specific and narrow." Kiga, 144 Wash.2d at 825, 31 P.3d 659. A general title need not contain a general statement of the subject or subjects of an act. Kiga, 144 Wash.2d at 825, 31 P.3d 659. "A few well-chosen words, suggestive of the general topic stated, are all that is necessary." Kiga, 144 Wash.2d at 825, 31 P.3d 659. A restrictive title, on the other hand, selects a particular part of a subject as the subject of the legislation. State v. Stannard, 134 Wash.App. 828, 836, 142 P.3d 641 (2006).
ś 56 Examples of restrictive titles are: "Shall criminals who are convicted of `most serious offenses' on three occasions be sentenced to life in prison without parole?"; "An act relating to the acquisition of property by public agencies. . . ."; "An act relating to local improvements in cities and towns"; and "An act relating to the rights and disabilities of aliens with respect to land. . . ." Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 210-11, 11 P.3d 762 (2000) (citations omitted). These examples show that restrictive titles tend to deal with issues that are subsets of an overarching subject. Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 633-34, 71 P.3d 644 (2003).
ś 57 Examples of general titles are: "An Act relating to violence prevention"; "An Act [r]elating to the amendment or repeal of statutes superseded by court rule"; "Shall campaign contributions be limited; public funding of state and local campaigns be prohibited; and campaign related activities be restricted?"; and "An Act to provide an Insurance Code for the State of Washington; to regulate insurance companies and the insurance business; to provide for an Insurance Commissioner; to establish the office of State Fire Marshall; to provide penalties for the violation of the provisions of this act. . . ." Amalgamated Transit, 142 Wash.2d at 208, 11 P.3d 762 (citations omitted).
ś 58 The title of chapter 333 is as follows: AN ACT Relating to specifying roles and responsibilities with respect to the treatment of persons with mental disorders; amending RCW 71.24.016, 71.24.045, 71.24.300, 71.24.310, 71.24.320, 71.24.330, 72.23.025, 71.05.230, 71.05.300, and 71.05.320; reenacting and amending RCW 71.24.025 and 71.24.035; adding a new section to chapter 71.24 RCW; adding a new section to chapter 71.05 RCW; creating new sections; repealing RCW 71.05.550; providing an effective date; and declaring an emergency.
ś 59 The County asserts without elaboration that this title is specific and narrow. We disagree. The title tells the reader that the statutes deal very broadly with treatment of persons with mental disorders. It does not specify a subset of issues within the mental health field.
ś 60 We next ask whether a rational unity exists among the matters addressed in the enactment. Kiga, 144 Wash.2d at 825-26, 31 P.3d 659. Rational unity requires that included subjects be reasonably connected to each other and to the enactment's title. Wash. Ass'n of Neighborhood Stores, 149 Wash.2d at 370, 70 P.3d 920. If the title states a general purpose, the bill may constitutionally include all matters that are reasonably connected with it and all measures that may facilitate the accomplishment of the purpose stated. Amalgamated Transit, 142 Wash.2d at 209, 11 P.3d 762.
ś 61 The County contends that there is no relationship between mental health treatment and prohibitions on counties, regional support networks, and contractors from challenging the lawfulness of the Department's actions under the Community Mental Health Services Act, and no connection between mental health treatment and the statutes authorizing persons and counties to pursue court action against the State. Read broadly, however, the topic of "roles and responsibilities with respect to the treatment of persons with mental disorders" is related to the manner in which disagreements concerning *615 such roles and responsibilities may be resolved. Thus, chapter 333 passes the single-subject requirement of article II, section 19.
ś 62 The second requirement is that an enactment's subject be stated in its title. This requirement is satisfied if the title of the act gives notice that would lead to an inquiry into the body of the act or indicates the scope and purpose of the law to an inquiring mind. Amalgamated Transit, 142 Wash.2d at 217, 11 P.3d 762; Brewster Pub. Sch. v. Pub. Util. Dist. No. 1 of Douglas County, 82 Wash.2d 839, 846, 514 P.2d 913 (1973). A title need not be an index to the contents of the bill, nor must it give the details contained in the bill. Retired Pub. Employees Council of Wash. v. Charles, 148 Wash.2d 602, 628, 62 P.3d 470 (2003). Any objections to a title must be grave, and the conflict between it and the constitution palpable, before we will hold an act unconstitutional for violating the subject-in-title requirement. Wash. Ass'n of Neighborhood Stores, 149 Wash.2d at 372, 70 P.3d 920.
ś 63 The County contends that the title of chapter 333 is insufficient to notify the average legislator that by denying rights of access to the courts, it amends the Administrative Procedure Act as well as RCW 4.92.010 (addressing rights of action against the State), RCW 7.24.010 (authorizing courts to render declaratory judgments), RCW 7.24.020 (allowing persons to sue for a declaration of statutory or contractual rights), and RCW 36.01.010 (allowing counties to sue). The language within chapter 333, however, does not amend these statutes. Rather, chapter 333 simply directs that disputes regarding state and county public mental health treatment responsibilities are to be resolved by nonjudicial means. The title of the chapter notifies an interested reader of the new and amendatory provisions affecting the right to judicial review, thereby satisfying the subject-in-title requirement of article II, section 19.
ś 64 In short, the 2006 legislation is constitutional, it applies to the trial court's injunctive relief, and it renders that relief unenforceable as of the date of the 2006 legislation. Accordingly, the trial court erred in denying the State's 2006 motion to vacate the injunction.

III. RESTITUTION AWARD
ś 65 At issue here is the trial court's award of $949,634 to compensate the County for its care of wait-listed long-term patients. The State assigns error to the following findings of fact and conclusions of law filed on January 23, 2006:

III. FINDINGS OF FACT

A. Financial Responsibility for Long Term Patients
. . . .
2. PCRSN [Pierce County Regional Support Network] incurred unreimbursed costs as a result of the refusal by Western State Hospital (WSH) of patients committed to the custody of Department of Social and Health Services (DSHS) for 90 or 180 days under the Involuntary Treatment Act (ITA).
3. The amount of PCRSN's unreimbursed costs of caring for 90 and 180 day patients committed to the custody of the DSHS under the ITA who WSH declined to accept for census reasons is reasonably and appropriately determined by using the "Medicare Ratio of Costs to Charges" method presented through the testimony of Dr. Neal Wallace and reflected in Trial Exhibit 1, or $772,588.07 for those patients listed on Exhibit 1.[[13]] Costs associated with these patients were calculated beginning at 12:01 AM on the day following WSH's refusal and continuing through the date of discharge from Puget Sound Behavioral Health (PSBH). PCRSN's unreimbursed costs are a liquidated sum.
. . . .
5. By agreement of the parties, unreimbursed costs for 90/180 day patients between October 18, 2005 and December 9, 2005 is $177,046.91.[[14]]
. . . .

*616 IV. CONCLUSIONS OF LAW

A. Long Term Patients

. . . .
2. Pursuant to the October 7, 2005 order, PCRSN is entitled to recover under a quasi contract or breach of contract claim, the unreimbursed costs of caring for patients committed by the courts to the custody of DSHS for 90 or 180 days pursuant to the Involuntary Treatment Act. Plaintiffs have no obligation under the statutes or their contract with the state, to provide care to long-term patients. Defendants breached their contracts with PCRSN by mistakenly interpreting those contracts as shifting responsibility for 90 or 180 day patients to PCRSN or alternatively under a quasi-contract theory.
3. Under quasi-contract or breach of contract, the unreimbursed costs claimed by PCRSN and depicted in Trial Exhibit 1 are reasonable and appropriate.
4. The appropriate measure of plaintiffs' unreimbursed costs is through the application of the Medicare Ratio of Cost To Charges to the charges incurred from 12:01 a.m. following the day of commitment if WSH declines to timely admit the patient until the date the patient was discharged from PSBH. The unreimbursed costs claimed by PCRSN and depicted in Trial Exhibit 1 and as set forth in the Findings are reasonable and appropriate.
5. With respect to 90 or 180 day patients committed to the custody of DSHS whom Western State Hospital declined to accept for census-related reasons subsequent to the last date indicated on Exhibit 1, defendants must compensate PCRSN for the unreimbursed costs of caring for those patients using the Medicare Ratio of Costs to Charges methodology set forth in Trial Exhibit 1.
6. PCRSN is entitled to recover the amount of unreimbursed costs set forth in the Findings. . . .
CP at 2701, 2706-07. The State also assigns error to those portions of the final judgment and order awarding judgment against it in the amounts set out above and determining how to calculate future long-term costs incurred by the County.
A. Statutory and Constitutional Authority
ś 66 The State argues that neither RCW 71.05.320(1) nor the Administrative Procedure Act justifies the trial court's monetary award to the County and that the award forced the Department to expend funds in excess of those appropriated for the regional support networks in violation of separation of powers principles. Having already addressed and rejected the State's argument concerning the trial court's interpretation of RCW 71.05.320(1), we need not do so again.
ś 67 To support its Administrative Procedure Act claim, the State cites a provision of that act stating that a court may award damages only to the extent expressly authorized by another provision of law. RCW 34.05.574(3). The County responds that the legal authorization for the award is the theory of quasi contract cited in the trial court's conclusions. Regardless of the validity of that theory, an award of damages is permissible in a judicial review brought under chapter 34.05 RCW. See Judd v. Am. Tel. & Tel. Co., 152 Wash.2d 195, 204-05, 95 P.3d 337 (2004) (holding that plaintiff should have brought claim for money damages and injunctive relief against state agency under Administrative Procedure Act); Sherman v. State, 128 Wash.2d 164, 206, 905 P.2d 355 (1995) (reversing summary judgment order without discussing damages that trial court awarded in action brought under Administrative Procedure Act).
ś 68 Although the State advises us that the legislature has appropriated funds to pay the restitution award, it nonetheless contends that the trial court infringed on the legislature's appropriation authority in granting the restitution award. It asserts that the Department has only those funds appropriated to it by the legislature under article VIII, section 4 of the Washington Constitution ("No moneys shall ever be paid out of the treasury of this state . . . except in pursuance of an appropriation by law"). The State argues that when the trial court awarded restitution damages, it violated the separation of powers doctrine, citing Hillis v. Department *617 of Ecology, 131 Wash.2d 373, 389-90, 932 P.2d 139 (1997).
ś 69 We find the "appropriations" argument moot since the legislature has appropriated funds to pay the restitution award. Turning to the separation of powers concern, we note that the developers in Hillis sought an order compelling the Department of Ecology (DOE) to process applications for groundwater rights. Hillis, 131 Wash.2d at 378, 932 P.2d 139. The applicable statute provided that when such an application was filed, it was DOE's "duty to investigate the application, and determine what water, if any, is available for appropriation, and find and determine to what beneficial use or uses it can be applied." RCW 90.03.290(1). In opposing the requested order, DOE asserted that its legislative appropriation was insufficient to allow it to process groundwater right applications when they were received. Hillis, 131 Wash.2d at 378, 932 P.2d 139. When the trial court ordered DOE to immediately process the Hillis applications, DOE sought review. Hillis, 131 Wash.2d at 380, 932 P.2d 139.
ś 70 The Supreme Court ultimately determined that whether DOE acted in an arbitrary and capricious manner or outside its statutory authority in failing to investigate the applications had to be decided in the context of its legislatively mandated budget restraints. Hillis, 131 Wash.2d at 388, 932 P.2d 139. The court concluded that ordering DOE to immediately process applications for water rights, thereby compelling the legislature to provide additional funds, would violate the separation of powers doctrine. Hillis, 131 Wash.2d at 390, 932 P.2d 139.
While we may find a waiting period of years to be intolerable, we would find it even more intolerable for the judicial branch of government to invade the power of the legislative branch. . . . While there are special situations when the courts can and should order the expenditure of funds, specific appropriation to fund a statutory right, not involving constitutional rights or judicial functions, is normally beyond our powers to order.
Hillis, 131 Wash.2d at 390, 932 P.2d 139 (footnote omitted).
ś 71 The County argues that subsequent cases hold that no separation of powers violation occurs when a court orders an agency to comply with a statutory directive. Washington State Coalition for the Homeless v. Department of Social and Health Services, 133 Wash.2d 894, 949 P.2d 1291 (1997), arose from a class action alleging that the Department had failed to comply with statutory requirements regarding services to the State's homeless children. The trial court entered declaratory and injunctive relief directing the Department to comply with its statutory obligations, and the Supreme Court upheld the relief granted. Wash. State Coal., 133 Wash.2d at 912-13, 949 P.2d 1291. In doing so, the court rejected the argument that the trial court's interference with an agency function violated the separation of powers doctrine:
Courts will not interfere with the work and decisions of an agency of the state, so long as questions of law are not involved, and so long as the agency acts within the terms of the duties delegated to it by statute. However, where the acts of public officers are arbitrary, tyrannical, or predicated upon a fundamentally wrong basis, then the courts may interfere to protect the rights of individuals. Here, the Department was not acting within the terms and duties delegated to it by RCW 74.13.031(1). The trial court's order, requiring [the Department] to perform its duty according to professionally accepted procedures and standards, did not interfere with the Department's ability to use its discretion in creating a reasonable, adequate plan that would satisfy the requirements of RCW 74.13.031(1).
Wash. State Coal., 133 Wash.2d at 913-14, 949 P.2d 1291 (citations omitted).
ś 72 In a later case, the court rejected the contention that any holding implicating the legislature's expenditure of funds would violate Hillis. McGowan v. State, 148 Wash.2d 278, 60 P.3d 67 (2002). The McGowan court held that an initiative providing for annual cost-of-living increases for school district employees required the State to fund increases for all district employees, not just state-funded employees. McGowan, 148 Wash.2d at *618 282, 60 P.3d 67. The majority rejected the dissent's argument that it was ordering the State to provide funding, reasoning instead that it was construing the initiative in accordance with its plain language. McGowan, 148 Wash.2d at 297 n. 3, 60 P.3d 67. The majority held that funding issues had nothing to do with the meaning of the language in the initiative, which was the issue before the court, and it declined to speculate on what appropriations would be made in light of its decision. McGowan, 148 Wash.2d at 297 n. 3, 60 P.3d 67.
ś 73 Washington State Coalition and McGowan are controlling. The trial court awarded restitution to the County after concluding that the Department was not complying with its statutory duty to provide care for the County's long-term committed mental health patients. The restitution award simply enforced the relationship between the State and the County by returning to the State its financial obligation for long-term care. Essentially, the restitution award required the State to comply with its statutory duty. And, as the McGowan court explained, when a court orders a state agency to comply with its statutory duty, the court need not speculate about whether the legislature will fund the solution. In any event, we are relieved from such speculation here because the legislature has appropriated the funds to pay the restitution award.
B. Common Law Authority
ś 74 The State next takes issue with the trial court's conclusion that the County is entitled to recover under a quasi-contract theory.
ś 75 The law generally recognizes two classes of implied contracts: contracts implied in fact, and contracts implied in law. Chandler v. Wash. Toll Bridge Auth., 17 Wash.2d 591, 600, 137 P.2d 97 (1943). The latter are termed quasi contracts. Chandler, 17 Wash.2d at 600, 137 P.2d 97. A quasi contract arises from an implied legal duty or obligation and is not based on a contract between the parties, or any consent or agreement. Chandler, 17 Wash.2d at 600, 137 P.2d 97; Auburn Mech., Inc. v. Lydig Constr., 89 Wash.App. 893, 900 n. 17, 951 P.2d 311 (1998). A contract implied in law is an obligation imposed on a person by the law. Chandler, 17 Wash.2d at 600, 137 P.2d 97. "`[W]hen the law imposes upon one an obligation to do something which he declines to do, and which must be done to meet some legal requirement, the law treats performance by another as performance for him, and implies a contract on his part to pay for it. . . .'" French v. Lewis & Clark County, 87 Mont. 448, 288 P. 455, 457 (1930) (quoting Keith v. De Bussigney, 179 Mass. 255, 259, 60 N.E. 614 (1901)). Payment is authorized under this theory when a person performs the noncontractual duty of another to supply necessaries to a third person and where one performs another's duty to the public, so long as the service was performed with the intent to seek remuneration for it. Chandler, 17 Wash.2d at 603.
ś 76 A contract implied in law is based on the principle that no one should be unjustly enriched at the expense of another. Lake Limerick Country Club v. Hunt Manufactured Homes, Inc., 120 Wash.App. 246, 261, 84 P.3d 295 (2004). Although a quasi-contract case invokes equitable principles, it is a legal action, and the relief given is a money judgment. Auburn, 89 Wash.App. at 905, 951 P.2d 311; see also Bort v. Parker, 110 Wash.App. 561, 580, 42 P.3d 980 (2002) (unjust enrichment is legal remedy in form of restitution).
ś 77 The State contends that the County's recourse to quasi contract is barred because a party to an express contract cannot bring an action on an implied contract relating to the same subject matter, in contravention of the express contract. Chandler, 17 Wash.2d at 604, 137 P.2d 97; Wash. Ass'n of Child Care Agencies v. Thompson, 34 Wash.App. 235, 238, 660 P.2d 1129 (1983); see also Clark-Fitzpatrick Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (impermissible to seek damages in quasi-contract action where valid written agreement clearly covers parties' dispute). This principle does not apply here because the contracts do not require the County to pay for long-term care. As the court stated in Auburn, the conduct of *619 one or more parties to an express contract may be such that performance is removed from the confines of the express contract. Auburn, 89 Wash.App. at 901, 951 P.2d 311; see also Mathias v. Jacobs, 238 F.Supp.2d 556, 572 (S.D.N.Y.2002) (applying unjust enrichment where written contract existed because contract did not explicitly cover the specific subject matter for which the implied agreement was sought). Because the contracts did not explicitly cover the County's responsibility for long-term care, they do not bar the County's claim based on quasi-contract principles.
ś 78 A person has been unjustly enriched when he has profited or enriched himself at the expense of another contrary to equity. Dragt v. Dragt/DeTray, LLC, 139 Wash.App. 560, 576, 161 P.3d 473 (2007). Enrichment alone will not trigger the doctrine; the enrichment must be unjust under the circumstances as between the two parties to the transaction. Dragt, 139 Wash.App. at 576, 161 P.3d 473. Unjust enrichment has three elements: (1) There must be a benefit conferred on one party by another; (2) the party receiving the benefit must have an appreciation or knowledge of the benefit; and (3) the receiving party must accept or retain the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value. Dragt, 139 Wash.App. at 576, 161 P.3d 473.
ś 79 The County claims that all three elements are satisfied here because the Department knowingly received and accepted a benefit at the County's expense by failing to accept long-term patients in a timely manner. The State maintains that it was not unjustly enriched because it distributed funds to the County to develop and manage a community-based health care system and because, after the trial court invalidated the liquidated damages provision, the Department could no longer offset the costs associated with the County exceeding its bed allocation.
ś 80 The State's contention ignores the inequity and illegality of a situation where the County paid for care of patients who were the State's responsibility, thereby reducing the State's long-term care costs. In addition, funds the County expended to pay for such long-term care were not available for other purposes that were within the County's scope of responsibility. Furthermore, even though the liquidated damages regulation was invalidated and rescinded as a result of this litigation, the 2006 legislature replaced it with new statutory provisions by which the regional support networks must reimburse the Department when they exceed their bed allocations. LAWS OF 2006, ch. 333, § 107(6)-(7) (codified at RCW 71.24.310(6)-(7)).
ś 81 The State makes the related argument that if the parties failed to clearly delineate the matter of reimbursement for waiting patients in the contracts, the County's remedy was to try to get the Department to amend the contract to include such a provision, or terminate the contract for convenience. As support, it cites Washington Association of Child Care Agencies, 34 Wash.App. at 241, 660 P.2d 1129. In that case, we held that private foster care agencies could not recover under a quasi-contract theory from the Department for its failure to adequately compensate them where the governing statute required only that the Department pay a reasonable rate for their services. Wash. Ass'n of Child Care Agencies, 34 Wash.App. at 238-39, 660 P.2d 1129. Because the Department appropriately promulgated reasonable rates, as the statute required, the State was not unjustly enriched by the underpayment of the agencies', costs. Wash. Ass'n of Child Care Agencies, 34 Wash.App. at 251, 660 P.2d 1129. In so holding, we cited with approval the trial court's observation that the agencies would have to determine for themselves whether it was reasonable to accept rates that did not fully compensate them for their costs. We also agreed with the trial court that the agencies would eventually refuse to provide the desired services if the rates were unreasonable. Wash. Ass'n of Child Care Agencies, 34 Wash.App. at 241, 660 P.2d 1129.
ś 82 This case differs from Washington Association of Child Care Agencies in several important respects. First, the State has violated a statutory duty by not providing and paying for care that it compelled the County to assume. Second, the contracts at *620 issue did not address the financial responsibility for such care. Third, the State's argument that the County could ask the State to amend the contracts ignores the reality that the State refused to assume its responsibilities for long-term care and that the contracts were designed to outline the County's and not the State's responsibilities for mental health care patients.
C. Equitable Support
ś 83 The State makes the final claim that equity does not support the award, citing the familiar provision that a person must come into a court of equity with clean hands. Income Investors, Inc. v. Shelton, 3 Wash.2d 599, 602, 101 P.2d 973 (1940). As stated above, quasi contract is a legal theory that invokes equitable principles, and a party cannot recover on that basis unless his enrichment is unjust. See Realmark Devs., Inc. v. Ranson, 214 W.Va. 161, 588 S.E.2d 150, 153 (2003) (unjust enrichment is the equitable reason for requiring payment for value of goods and services received). The State argues that the County's overuse of beds at Western State Hospital was the primary reason that timely admissions did not occur and that the County consistently failed to honor its obligation to avoid long-term care admissions. The State also contends that the relief awarded is illogical because the costs incurred by taking care of patients on the waiting list were controlled by the County and, according to the State, were excessive.
ś 84 The County responds that because the State never found it to be out of compliance with the contracts, the "unclean hands" argument lacks support. As the County asserts, the State points to no contractual provision that required the County to avoid long-term admissions. Furthermore, the State's argument is not with the amount of restitution awarded but with the award itself, and its excessive expenditures argument does not address whether the County is entitled to any award at all. Moreover, the County does not control the number of persons involuntarily committed for long-term care. At most, a County agent may initiate the process by filing a petition of commitment. The actual commitment decision is made by a superior court judge or jury after finding adequate evidence to meet the standards of RCW 71.05.280. RCW 71.05.320(1).
ś 85 Finally, the State's argument regarding the County's overuse of beds is a matter of some dispute between the parties that was not resolved by any factual findings. The trial court did find that the State violated its statutory obligation to provide long-term care under RCW 71.05.320(1), that the County incurred costs in providing care that the State should have provided, and that the State should now be held responsible for reimbursing those costs under a theory of unjust enrichment. Nothing in the record supports the State's argument that it is inequitable to allow the County to recoup its losses from supporting patients whom the State was legally obligated to support.

IV. LIQUIDATED DAMAGES
ś 86 The Department argues that the trial court erred by invalidating the liquidated damages provisions of former WAC XXX-XXX-XXXX and the contractual provisions incorporating them and by ordering it to refund the liquidated damages the County had paid under the contracts. The Department assigns error to the following findings of fact, conclusions of law, and injunction the trial court entered in granting the County's motion for partial summary judgment on liquidated damages:
I. Findings of Fact
. . . .
(3) Application of the liquidated damages provisions of WAC XXX-XXX-XXXX interferes with or impairs or immediately threatens to interfere with or impair the legal rights or privileges of Pierce County and has substantially prejudiced Pierce County by depriving it of funds which it otherwise would have received under its contracts with DSHS.
II. Conclusions of Law
1. Plaintiffs' claims under Ch. 34.05 are reviewable under RCW 34.05.570(2) and (4).

*621 2. DSHS exceeded its statutory authority in promulgating, applying, and continuing to apply the automatic liquidated damages provisions of WAC XXX-XXX-XXXX(l)-(2) and acted outside of its statutory authority when it incorporated the liquidated damages provision of WAC XXX-XXX-XXXX(l)-(2) into its contracts with PCRSN.
3. Accordingly, the liquidated damages provisions of WAC XXX-XXX-XXXX and related provisions of the PCRSN contracts with DSHS were and are invalid and unenforceable. Pierce County is entitled to a refund of the amount of liquidated damages proven at trial to have been withheld and interest thereon.
III. Injunction
Pursuant to RCW 34.05.574, Defendants are enjoined from further enforcement of the automatic liquidated damages provisions of WAC XXX-XXX-XXXX and related provisions of its contracts with PCRSN as currently written.[[15]]
CP at 1856-57.
ś 87 The Department also assigns error to the following conclusions of law from the trial court's final judgment and order:
B. Liquidated Damages

1. PCRSN is entitled to a refund of the amount of liquidated damages withheld.
. . . .
3. Although neither the plaintiffs nor their providers suffered a loss from the withholding of liquidated damages, the State should in no way benefit from wrongfully withholding the liquidated damages from the plaintiffs. As a result, the Court has fashioned an equitable remedy: the PCRSN's entitlement to a refund of liquidated damages paid and interest thereon is conditioned upon the use of the refunded liquidated damages and interest to provide new or additional mental health services within its service area. Upon payment to PCRSN by Defendants of the amount representing the unlawfully withheld liquidated damages and interest thereon, PCRSN must hold those funds and not disburse them until a plan for their use is either approved by Defendants or by this Court. Defendants shall not unreasonably fail to approve such a plan.
CP at 4334. And the Department assigns error to the portion of the final judgment and order fixing the amount of the refund of liquidated damages at $1,082,435.35.
A. Validity of Former WAC XXX-XXX-XXXX
ś 88 Former WAC XXX-XXX-XXXX contained a formula for allocating state hospital beds among the regional support networks. This formula was based on the regional support network's population, the number of persons eligible for Medicaid funding in the regional support network, the regional support network's average daily census at the state hospital, and the number of funded beds at the hospital. Former WAC XXX-XXX-XXXX(1). It also contained a formula for "liquidated damages" that the Department would assess against regional support networks that had exceeded their bed allocation at times when the hospital exceeded its funded capacity. Former WAC XXX-XXX-XXXX(3). The Department based liquidated damages on the hospital's daily bed charge and the number of patients by which the regional support network had exceeded its allocation.[16] Former WAC XXX-XXX-XXXX(3)(b)-(c).
*622 ś 89 An administrative rule has force of law only if the agency promulgated it with delegated authority. Campbell v. Dep't of Soc. & Health Servs., 150 Wash.2d 881, 892, 83 P.3d 999 (2004) (citing State v. Brown, 142 Wash.2d 57, 62, 11 P.3d 818 (2000)). An agency does not have the power to promulgate rules that amend or change legislative enactments, but it may "`fill in the gaps'" in legislation where necessary to effectuate a general statutory scheme. Green River Cmty. Coll. v. Higher Educ. Pers. Bd., 95 Wash.2d 108, 112, 622 P.2d 826 (1980) (quoting Hama Hama Co. v. Shorelines Hearings Bd., 85 Wash.2d 441, 448, 536 P.2d 157 (1975)). We presume that a rule adopted under a legislative grant of authority is valid if it is "`reasonably consistent with the statute being implemented.'" Campbell, 150 Wash.2d at 892, 83 P.3d 999 (quoting Fahn v. Cowlitz County, 93 Wash.2d 368, 374, 610 P.2d 857, 621 P.2d 1293 (1980)).
ś 90 But we will invalidate an agency regulation if it exceeds the agency's statutory authority. RCW 34.05.570(2)(c); Jenkins v. Dep't of Soc. & Health Servs., 160 Wash.2d 287, 295, 157 P.3d 388 (2007). A party attacking the validity of an administrative rule must show compelling reasons why the rule conflicts with the legislation's intent and purpose. RCW 34.05.570(1)(a); Green River Cmty. Coll., 95 Wash.2d at 112, 622 P.2d 826. The validity of a regulation is a question of law that we review de novo. H & H P'ship v. State, 115 Wash.App. 164, 168, 62 P.3d 510 (2003) (citing State v. Ford, 110 Wash.2d 827, 831, 755 P.2d 806 (1988)).
ś 91 The Department asserts that the liquidated damages provision of former WAC XXX-XXX-XXXX was within the broad rulemaking authority the legislature has granted it. It maintains that it imposed liquidated damages as part of its responsibility to distribute limited resources across the state mental health system and that the rule equalized differences in the availability of beds between the state hospitals and among the regional support networks.
ś 92 The legislature delegated to the Department the authority to promulgate rules implementing both the Involuntary Treatment Act and the Community Mental Health Services Act. See RCW 71.05.560 (granting authority to adopt rules to effectuate the purpose and intent of the Involuntary Treatment Act); RCW 71.24.035(5)(c) (granting authority to adopt rules establishing standards for the delivery of mental health services in the community under the Community Mental Health Services Act). The Department relied on these statutes as authority for promulgating former WAC XXX-XXX-XXXX.[17] But no provision of the Involuntary Treatment Act or Community Mental Health Services Act expressly granted the Department authority to impose liquidated damages on regional support networks that exceeded their state hospital bed allocations. Thus, we must determine whether the regulation was reasonably consistent with the intent and purposes of the acts. Campbell, 150 Wash.2d at 892, 83 P.3d 999.
ś 93 The Department maintains that former WAC XXX-XXX-XXXX was consistent with the legislature's intent that the state hospitals treat the most complicated long-term needs of mental health patients and that the community mental health system focus on maintaining individuals with mental illness in the community, citing RCW 71.24.016.[18] The *623 Department does not explain, however, how imposing liquidated damages on regional support networks is consistent with this intent. The County, on the other hand, asserts that liquidated damages contradict the purpose and intent of the Involuntary Treatment Act and the Community Mental Health Services Act by reducing the resources available to the regional support networks to provide evaluation and treatment services in the community.
ś 94 As explained above, the Involuntary Treatment Act and the Community Mental Health Services Act place responsibility for long-term care solely on the State. The statute authorizing the State to enter into contracts with regional support networks requires the contracts to address short-term commitments, residential care, and emergency response systems, but it does not mention any responsibility for long-term care on the part of the regional support networks. RCW 71.24.035(15)(b). And the statute detailing the roles and responsibilities of the regional support networks required them to provide at least 85 percent of evaluation and treatment services within their boundaries and. to provide for numerous other mental health services, including patient counseling, day treatment, consultation, education services, employment services, and children's mental health services; the statute did not specify that they were responsible for any aspect of long-term care. Former RCW 71.24.300(l)(d), (f) (2004). Any effort to shift responsibility for long-term care from the State to the regional support networks is inconsistent with these legislative directives.
ś 95 Moreover, the Community Mental Health Services Act permitted the Department to create financial incentives for regional support networks in order to "reward the achievement of superior outcomes, or significantly improved outcomes." Former RCW 71.24.035(13)(c). But the only statutory authority for withholding funds from regional support networks permits the Department to deny funding to regional support networks based "solely upon formal findings of noncompliance with the terms of the regional support network's contract with the department." Former RCW 71.24.035(15)(e) (2004). This statute requires 30 days' written notice to the regional support network and an opportunity for the regional support network to take corrective action. Former RCW 71.24.035(15)(e). Yet former WAC XXX-XXX-XXXX imposed liquidated damages without requiring a formal finding or written notice of noncompliance, and without providing a regional support network the opportunity to take corrective action.
ś 96 The legislature's action after this litigation is also instructive. See Green River Cmty. Coll., 95 Wash.2d at 118, 622 P.2d 826 (considering legislature's subsequent acts in determining validity of administrative rule). In 2006, it amended RCW 71.24.310 to read:
The legislature finds that administration of chapter 71.05 RCW and this chapter can be most efficiently and effectively implemented as part of the regional support network defined in RCW 71.24.025. For this reason, the legislature intends that the department and the regional support networks shall work together to implement chapter 71.05 RCW as follows. . . .
LAWS OF 2006, ch. 333, § 107 (codified at RCW 71.24.310).[19] The statute now directs the regional support networks to recommend a formula for allocating state hospital beds among them, and directs the Department, to adopt a formula if the regional support networks cannot reach a consensus. RCW 71.24.310(1)-(3). It encourages the Department to enter "performance-based contracts" *624 with the regional support networks to provide some or all of the regional support networks' allocated long-term inpatient treatment capacity in the community, rather than in a state hospital. RCW 71.24.310(5). And it provides that, if a regional support network exceeds its state hospital bed allocation, it shall "reimburse the department for that care," and sets forth a formula for reimbursement.[20] RCW 71.24.310(6). The Department must use one-half of any reimbursements it receives for hospital operating costs and distribute the other half among the regional support networks that have used less than their bed allocation. RCW 71.23.310(7).
ś 97 This amendment created a duty on the part of the regional support networks to reimburse the Department for long-term care when they exceed their bed allocation. But it did not authorize the Department to impose liquidated damages against the regional support networks. The statute also now ensures that one-half of any reimbursements will go toward community-based services, albeit in regional support networks other than those that have exceeded their bed allocation, thus promoting, rather than frustrating, the goal of the Community Mental Health Services Act to provide mental health services in the community.
ś 98 The Involuntary Treatment Act places responsibility for long-term care solely on the Department; the Community Mental Health Services Act encourages counties to take responsibility for only short-term care in the community. Regional support networks must now reimburse the Department for exceeding their bed allocations, but the statutes do not authorize the Department to impose liquidated damages on the regional support networks. Former WAC XXX-XXX-XXXX conflicted with the Community Mental Health Services Act by imposing "liquidated damages" where none were authorized and by shifting the cost of long-term care to regional support networks when the law required them to provide only short-term care.
ś 99 The Department insists that the former regulation accomplished its intended purpose, reducing the number of patients admitted to Western State Hospital from the County. If an enabling statute does not authorize a regulation either expressly or by implication, however, that regulation is invalid regardless of its practical necessity or appropriateness. In re Impoundment of Chevrolet Truck, Wash. License No. A00125A, 148 Wash.2d 145, 156-57, 60 P.3d 53 (2002) (quoting Wash. Indep. Tel. Ass'n v. Telecomms. Ratepayers Ass'n for Cost-Based & Equitable Rates, 75 Wash.App. 356, 363, 880 P.2d 50 (1994)). The trial court did not err in invaliding the liquidated damages provisions of former WAC XXX-XXX-XXXX.
B. Validity of Contractual Provisions
ś 100 The Department further contends that the trial court erred in invalidating the contract provisions incorporating former WAC XXX-XXX-XXXX because the County voluntarily signed the contracts containing these provisions. The Department points to the fact that although the County objected to several contract provisions during negotiations, it never objected to the liquidated damages provisions.
ś 101 A contract that conflicts with statutory requirements is illegal and unenforceable as a matter of law. Failor's Pharmacy v. Dep't of Soc. & Health Servs., 125 Wash.2d 488, 499, 886 P.2d 147 (1994) (citing Hederman v. George, 35 Wash.2d 357, 362, 212 P.2d 841 (1949)). And a government contract that exceeds an agency's authority is void and unenforceable. Failor's Pharmacy, 125 Wash.2d at 499, 886 P.2d 147 (citing Chem. Bank v. Wash. Pub. Power Supply Sys., 99 Wash.2d 772, 797-98, 666 P.2d 329 (1983)). Because the Department exceeded its statutory authority in imposing liquidated damages against regional support networks, those portions of the contracts incorporating former WAC XXX-XXX-XXXX are invalid and unenforceable, regardless of whether the County may have agreed to them.
*625 ś 102 Further, the contracts themselves specify that any provisions that conflict with state or federal law are deemed amended to conform to the law.[21] The provisions imposing liquidated damages on the County conflicted with the Involuntary Treatment Act and the Community Mental Health Services Act. The trial court did not err in invalidating these contract provisions. The County's failure to object is irrelevant.
C. Refund of Liquidated Damages
ś 103 Finally, the State argues that the trial court erred in ordering it to refund the liquidated damages the County paid under the contracts, asserting that the County incurred no financial loss because it passed the cost on to its subcontractors. The County responds that the refund order was appropriate because payment of liquidated damages reduced the funds available for community-based mental health services in Pierce County.
ś 104 In granting the County's motion for partial summary judgment, the trial court found that imposing liquidated damages prejudiced the County by depriving it of funds that it would otherwise have received under the contracts. After trial, the trial court found that the liquidated damages did not cause economic harm to the County or its subcontractors because they merely reduced the services they provided; the court also found that if the State had not withheld liquidated damages, the County and its providers would have used the funds to provide additional mental health services. In ordering the State to refund the damages, the trial court provided that the County could use the funds only to provide new or additional mental health services within its service area.
ś 105 The State's argument here ignores the trial court's finding that, although the County and its subcontractors suffered no economic harm because of the liquidated damages, they were unable to provide over $1,000,000 in community-based mental health services to Pierce County residents. The trial court's order reflects this finding by requiring the County to use the refunded liquidated damages to provide mental health services within its service area.
ś 106 Although the County's harm was not financial, a refund of the liquidated damages, coupled with the order to use those funds for community-based mental health services, compensates the County for the harm it and its residents suffered as a result of the wrongfully imposed liquidated damages. The trial court did not err in ordering the State to refund the liquidated damages it withheld.

V. MEDICAID SAVINGS
ś 107 In its cross appeal, the County argues first that the 2001-03 and 2003-05 contracts required it to use Medicaid funds to pay for services not covered by Medicaid, and that it is entitled to recover these funds. The County maintains that Medicaid policy prohibited the Department from requiring the County to use Medicaid funds in this manner. It asserts that the trial court erred in concluding that the federal government tacitly permitted the practice and that the County voluntarily agreed to it. The County reasons that it is entitled to a refund of this money under the contract provisions amending the contracts to conform to federal and state law.[22]
ś 108 The trial court entered the following findings of fact and conclusions of law pertinent to this issue.[23]

*626 III. Findings of Fact
. . . .
C. Contract Process and Contract Terms.
. . . .
2. By failing to stop the process whereby the State used its resources to draw down additional federal dollars not needed to provide the Medicaid services to patients within the state of Washington, the federal government tacitly agreed to this use. The biennial waivers between CMS [the Center for Medicaid and Medicare Services] and DSHS provide further evidence that the use of Medicaid funds was acceptable to the federal government.
3. In the 01-03 and 03-05 biennia, PCRSN contracted with DSHS to provide community mental health treatment services to both Medicaid and non-Medicaid recipients. PCRSN objected to several aspects of the 2001-03 and 2003-05 RSN contracts prior to signing. . . . But it was not the features of the failure to provide sufficient state-only dollars to fund these contracts that were the subject of the protest or the objections.
4. Before signing the contracts, Pierce County knew that the contracts did not provide sufficient state-only funds to deliver all services Pierce County might provide under the contracts.
. . . .
7. For the 01-03 and 03-05 contract period, Pierce County RSN elected to sign the contracts despite the objections it raised.
8. DSHS contracted with Pierce County RSN to provide community mental health services within the amount of funding appropriated by the legislature. The contracts identified specific services to be provided and the specific amounts that were available to provide those services. Any services, and funds used by PCRSN to provide services beyond the amount of state-only and/or Medicaid funds appropriated by the [l]egislature and allocated through the contracts and legislative appropriations were voluntarily provided.
. . . .
9. Based on the total amount of funding appropriated by the [l]egislature and allocated to PCRSN under the contracts, it had available all of the financial resources it needed to pay for the services it provided under the 01-03 and 03-05 contracts.
D. Federal Medicaid Law and Policy
1. The general federal policy is that Medicaid dollars are to be used for Medicaid treatment services.
2. In a 1998 letter from CMS . . . to Medicaid state directors, CMS indicated that it would not permit the State to require Medicaid money to be used for non-Medicaid services. . . . Beginning July 1, 2005, CMS made it clear that Medicaid dollars were not to be used under any circumstances, voluntary or mandated, to provide non-Medicaid services.
3. During at least the interim between July 1, 2000 and before July 1, 2005, CMS tacitly permitted the use of Medicaid dollars for other services.
4. By signing the 2001-03 and 2003-05 RSN contracts, Pierce County RSN relied on Medicaid funds to pay for non-Medicaid services as was permitted by the federal government until July 1, 2005. Pierce County knew that the contracts did not provide sufficient *627 state-only funds to provide the non-Medicaid services required under the contract. Sometime prior to July 1, 2005, CMS determined that it had been paying too much for Medicaid services in the State of Washington. So, beginning July 1, 2005, CMS will pay less.
. . . .
IV. Conclusions of Law
. . . .
C. Contract Process and Contract Terms
. . . .
4. According to RCW 71.24.300, the Pierce County RSN had no obligation to provide any mental health treatment resources for non-Medicaid patients beyond the resources that were available according to the statutory provision. But in no case did Pierce County have the right to be compensated for services it did provide beyond the state-only resources provided under the contract because it chose to do so.
5. If Pierce County believed that it did not have sufficient resources required by statute for the provision of these services, its remedy was to not provide the services. The remedy was not to provide millions of dollars' worth of services specifically identified in the contract with specific contractual amounts and then to later seek additional reimbursement for the already provided services.
6. The remedy would have been for Pierce County not to have provided those services if it believed that they were not within the statutory definition. Pierce County had a legal right to terminate the contracts by giving only 90 days notice and voluntarily chose not to terminate.
. . . .
D. Contracts and Medicaid Law and Policy
1. During the relevant time period between July 1, 2000 and before July 1, 2005, CMS tacitly permitted the use of Medicaid dollars for nonMedicaid services.
2. The 01-03 and 03-05 contracts allocated state-only money and Medicaid money appropriated by the [l]egislature. Pierce County knew, before signing the contracts, that there would not be enough state-only money to cover all the contract services and that it would be using Medicaid funds provided under the waiver to cover nonMedicaid services.
3. Pierce County was not legally required to sign the 01-03 and 03-05 contracts.
4. Pierce County's entry into these contracts was a voluntary acceptance and determination as to how all of the funds provided for under the contracts, both Medicaid and state-only funds, would in fact be used.
5. The 01-03 and 03-05 contracts are not invalid and do not violate federal policy in the expenditure of what has been referred to in this trial as Medicaid savings for non-Medicaid services.
CP at 4328-30, 4334-36.
ś 109 Where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the trial court's findings and, if so, whether the findings in turn support the conclusions of law and the judgment. City of Tacoma v. State, 117 Wash.2d 348, 361, 816 P.2d 7 (1991). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the finding. Fred Hutchinson Cancer Research Ctr. v. Holman, 107 Wash.2d 693, 712, 732 P.2d 974 (1987). If the evidence satisfies this standard, we will not substitute our judgment for the trial court's, even though we may have resolved disputed facts differently. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 879-80, 73 P.3d 369 (2003).
A. Medicaid Policy
ś 110 The County contends that the Department violated Medicaid policy by requiring the County to use its "Medicaid savings," the amount of Medicaid funds it did not use in providing Medicaid services, to provide non-Medicaid services. The County asserts that the trial court's finding that the federal government tacitly permitted this practice is *628 not supported by substantial evidence and, in any event, is immaterial to the question of whether the contracts violated Medicaid policy.
ś 111 In 1998, the director of the center for Medicare and Medicaid services sent a letter to all state Medicaid directors informing them of the center's resolution of a "policy concern" with certain states' practice of requiring in their contracts that providers use their Medicaid savings to provide services to persons who are not eligible for Medicaid. Ex. 45. The center viewed this practice as providing an "inappropriate subsidy for services for the uninsured," in violation of section 1903(m)(2)(A)(iii) of the Social Security Act (codified at 42 U.S.C. § 1396b(m)(2)(A)(iii)). Ex. 45. The center announced that it would no longer approve waiver applications that contained such a requirement. But the center recognized that a provider may meet its contractual obligations to serve Medicaid beneficiaries within the money received and then use the savings as it wishes, including voluntarily choosing to provide services to people who are not eligible for Medicaid.
ś 112 In 2004, when the center approved the State's waiver renewal application for the 2005-07 period, it announced that it would require the State to establish a community reinvestment fund where the regional support networks must deposit their Medicaid savings. The State could use this fund to support the development of community-based mental health services for Medicaid recipients only.[24] This limitation on the use of Medicaid savings went into effect on July 1, 2005. The center planned to conduct an audit to determine whether any Medicaid funds were being used to provide non-Medicaid services.
ś 113 During the effective dates of the 2001-03 and 2003-05 contracts, Medicaid policy permitted providers to use their Medicaid savings to fund non-Medicaid services, provided that the Department did not require this use. The center reviewed the contracts as part of its approval process for the Department's waiver renewal applications. And the center approved the waiver renewals each time. The center never raised any concerns about the Department forcing the regional support networks to use Medicaid savings to provide non-Medicaid services. This is substantial evidence to support the trial court's finding that the center tacitly permitted the use of these funds.
ś 114 But the County argues that the center's tacit approval of the use of Medicaid funds for non-Medicaid services or its failure to enforce its own policy is immaterial to the legality of the contracts. The center made it clear, however, that a provider's voluntary use of Medicaid savings for non-Medicaid services was not a violation of Medicaid policy during the relevant time period. Thus, the question becomes whether the County voluntarily used its Medicaid savings to provide non-Medicaid services.
B. County's Agreement to Use Medicaid Savings
ś 115 The County argues that the trial court's finding that it voluntarily used its Medicaid savings for non-Medicaid services confuses the decision to enter into the contracts with the terms of the contracts and ignores the relevant issue: whether the contracts required, or merely permitted, the County to use its Medicaid savings for non-Medicaid services.
ś 116 The contracts required the County to provide mental health treatment services to both Medicaid recipients and those not enrolled in Medicaid. The contracts also allocated both Medicaid and state-only funds to the County. The contracts did not, on their face, require the County to use its Medicaid savings to provide non-Medicaid services; they only required the County to use its savings to support the public mental health system.[25] The contracts, however, did not *629 provide sufficient state funds to pay for all the non-Medicaid services the County might deliver. They did provide a total amount of funds sufficient to pay for all the services the County provided. The County was aware that the contracts did not provide sufficient state funds to pay for all the non-Medicaid services it might deliver under the contracts.
ś 117 During the contract negotiation process, the County did not object that the Department was forcing it to use its Medicaid savings to provide non-Medicaid services. The County, knowing that it would not receive sufficient state funds to cover all the non-Medicaid services it was agreeing to provide, signed the contracts. The Department did not force the County to sign the contracts, and the County knew that it could choose not to sign. In signing them, the County voluntarily agreed to the contracts' determination of how it would spend its Medicaid savings.
ś 118 The County asserts that Medicaid policy required that the contracts themselves give the County a voluntary choice as to how it used its Medicaid savings. But the 1998 letter, the only evidence of Medicaid policy on this point in the record, did not make this distinction. It prohibited states from requiring providers to pay for non-Medicaid services with Medicaid savings; it did not say that this choice must be written into the contracts.
ś 119 The County argues that it was entitled to rely on the contract terms specifying that any provisions that conflicted with state or federal law were deemed amended to conform to the law. It maintains that these clauses ensure that it did not need to choose between acquiescing to illegal terms and surrendering its local mental health system to the Department. In the context of the Medicaid policy that permitted the County to voluntarily agree to a certain practice, however, the County cannot accept the contract terms and later claim the State forced it to comply with them.
ś 120 The trial court did not err in concluding that the 2001-03 and 2003-05 contracts did not violate Medicaid policy.

VI. THE 85 PERCENT REQUIREMENT
ś 121 During the relevant period, former RCW 71.24.300(l)(d) (2004) required the regional support networks to "[p]rovide within the boundaries of each regional support network evaluation and treatment services for at least eighty-five percent of persons detained or committed for periods up to seventeen days according to chapter 71.05 RCW."[26] The County sought a declaration that Western State Hospital is within the boundaries of the County's regional support network for purposes of this requirement and that the County may use the hospital to meet its obligation to provide 85 percent of short-term care within the County's boundaries. The trial court denied the County's motion for summary judgment on this claim, but it granted the County's motion to dismiss the State's counterclaim alleging that the County violated the contracts by failing to meet the 85 percent requirement.
ś 122 The County argues that the trial court erred in rejecting its claim that it could count the short-term care provided at the Western State Hospital toward its obligation to provide 85 percent of short-term evaluation and treatment needs within the County's boundaries. It asserts that the statute's language is unambiguous and focuses only on the geographic location of services. The County also contends that providing short-term care at Western State Hospital, which is within the County's geographical boundaries, is consistent with the Community Mental Health Services Act's goal of providing treatment within the community because *630 county residents receiving evaluation and treatment services at Western State Hospital remain "close to home." Br. of Resp't at 67-68. The County points out that the statute does not require that the regional support networks provide short-term care in any particular facility and that it does not specifically exclude the use of state hospitals to meet this requirement.
ś 123 The County is correct that the statute unambiguously requires 85 percent of short-term care to take place within its geographical boundaries. But the County's focus on the language requiring regional support networks to provide short-term evaluation and treatment services "within the boundaries of each regional support network" ignores the statute's requirement that the regional support networks must themselves "provide" these services. This requirement, too, is unambiguous. See J.P., 149 Wash.2d at 450, 69 P.3d 318 (a statute is unambiguous where its language has only one meaning). We cannot delete language from an unambiguous statute. J.P., 149 Wash.2d at 450, 69 P.3d 318. It is the State, not the County, that operates the state hospitals. See RCW 72.23.010(9) (a state hospital is a hospital operated by the State for the care of the mentally ill). The County does not explain how the State's providing short-term evaluation and treatment services at Western State Hospital counts toward the County's duty to provide 85 percent of this care. The statute unambiguously requires the County, not the State, to provide 85 percent of the care.
ś 124 Moreover, the County's proposed interpretation of former RCW 71.24.300(l)(d) (2004) would mean that, between the care the County provides in its community-based facilities and the short-term care provided at Western State Hospital, the County would always provide 100 percent of short-term care within its boundaries, even if the State was providing most of the care at Western State Hospital. This would effectively excuse the County from complying with the 85 percent requirement while maintaining the requirement for the regional support networks that do not contain a state hospital within their geographic boundaries.[27] We do not interpret a statute in a manner that renders a provision meaningless or creates an absurd or strained result. J.P., 149 Wash.2d at 450, 69 P.3d 318. The County's proposed interpretation would do both.
ś 125 Further, our primary duty in interpreting any statute is to discern and implement the legislature's intent. J.P., 149 Wash.2d at 450, 69 P.3d 318. And providing short-term evaluation and treatment services within state hospitals is contrary to the Community Mental Health Services Act's intent. The Community Mental Health Services Act's intent section provides that the legislature intends that "the community mental health service delivery system focus on maintaining mentally ill individuals in the community." RCW 71.24.016(1). And as part of the 2006 amendments that increased the percentage of short-term care the regional support networks must provide within their boundaries, the legislature expressed its intent to require the use of "practices that are effective in serving individuals in their community and will reduce the need for placements in state mental hospitals," and encouraged the regional support networks to avoid placement of people with mental illness in the state hospitals. LAWS OF 2006, ch. 333, § 102 (codified at RCW 71.24.016(2)-(3)). The legislature recognizes that the state hospitals, are separate from local communities, not a part of them. Permitting the County to use Western State Hospital to meet the 85 percent requirement would be contrary to the legislature's intent to maintain mentally ill individuals in the community as much as possible.
ś 126 The County also maintains that prior to asserting its counterclaim that the County violated the contracts by failing to meet the 85 percent requirement, the Department took the position that the County could use Western State Hospital to provide evaluation and treatment services. It points out that the Department never made a finding that the County was not in compliance with the 85 percent rule. The County finds *631 further support for this assertion in a memorandum that the mental health division's chief of community services wrote to its director in 2000, stating, "Pierce RSN was told by previous MHD administration to not build E & T's [evaluation and treatment facilities] but to utilize WSH as their E & T." CP at 1548-49. But where a statute is unambiguous, we determine legislative intent from the language of the statute itself, not an administrative agency's contrary interpretation. Agrilink Foods, Inc. v. Dep't of Revenue, 153 Wash.2d 392, 396, 103 P.3d 1226 (2005). Even if this statement represents the Department's interpretation of RCW 71.24.300, it is contrary to the statute's plain language and we will not uphold it.
ś 127 Finally, both parties make much of RCW 71.24.300's legislative history. The State argues that the history shows that the legislature considered adding language to the Involuntary Treatment Act that would have excused regional support networks that contain state hospitals within their boundaries from the 85 percent requirement, but it ultimately did not adopt that language. The County responds that, if the legislature had wanted to exclude short-term care provided at the state hospitals from the 85 percent requirement, it could have done so, and points out that the legislature did not do this when it amended the statute after the County filed this lawsuit. The County also points to other legislative history that it asserts contradicts the State's reading of the legislature's intent. But when a statute is clear and unambiguous on its face, we determine its meaning from its language alone; we do not consider the legislative history. C.J.C. v. Corp. of the Catholic Bishop of Yakima, 138 Wash.2d 699, 708, 985 P.2d 262 (1999).
ś 128 The trial court did not err in ruling that the County cannot count short-term care provided at Western State Hospital toward its obligation to provide 85 percent of short-term evaluation and treatment services within its boundaries.

VII. PREJUDGMENT INTEREST
ś 129 The trial court awarded the County $949,634.98 for its unreimbursed costs of providing long-term care and $1,082,435.35 as reimbursement for the liquidated damages that the State withheld, but the trial court declined to award the County prejudgment interest. The County argues that the trial court erred in denying its request because the State waived its sovereign immunity when it entered into the contracts.
ś 130 A trial court may award prejudgment interest on a liquidated claim. Safeco Ins. Co. v. Woodley, 150 Wash.2d 765, 773, 82 P.3d 660 (2004). A claim is liquidated where the evidence makes it possible to compute the amount with exactness, without reliance on opinion or discretion. Scoccolo Constr. Inc. v. City of Renton, 158 Wash.2d 506, 519, 145 P.3d 371 (2006). Washington courts generally favor prejudgment interest based on the premise that a party that retains money it should have paid to another should be charged interest. Seattle-First Nat'l Bank v. Wash. Ins. Guar. Ass'n, 94 Wash.App. 744, 760, 972 P.2d 1282 (1999) (citing Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 34, 442 P.2d 621 (1968)). We review a trial court's decision on prejudgment interest for abuse of discretion. Scoccolo, 158 Wash.2d at 519, 145 P.3d 371. A trial court abuses its discretion when it exercises its discretion on untenable grounds or for untenable reasons. Hadley v. Maxwell, 120 Wash.App. 137, 141, 84 P.3d 286 (2004).
ś 131 In general, as a matter of sovereign immunity, the State cannot be held to interest on its debts without its consent. Architectural Woods, Inc. v. State, 92 Wash.2d 521, 523-24, 598 P.2d 1372 (1979). The State can consent to liability for interest by waiving sovereign immunity, either expressly or impliedly. Architectural Woods, 92 Wash.2d at 526, 598 P.2d 1372. When the State enters into an authorized contract with a private party, the State impliedly waives its sovereign immunity and consents to the same responsibilities and liabilities as the private party, including liability for interest. Architectural Woods, 92 Wash.2d at 526-27, 598 P.2d 1372. Such an implied waiver is the result of two discrete acts: first, the legislature must enact a statute authorizing the State to enter into the contract; then, the State must enter into the legislatively authorized *632 contract. Architectural Woods, 92 Wash.2d at 527, 598 P.2d 1372.
ś 132 The trial court denied prejudgment interest because it concluded that, although the legislature authorized the Department to contract with the regional support networks to provide mental health care, the legislature did not authorize the Department to contractually impose liquidated damages, and there was no contract between the Department and the County regarding long-term care. The trial court reasoned that therefore the State did not waive sovereign immunity with respect to the liquidated damages it imposed (because that portion of the contract was unauthorized) or the long-term care the County provided (because the Department did not enter into a contract for that care). The trial court also stated that Architectural Woods was not on point because this case involves a contract between the State and another governmental agency, not the State and a private party as in Architectural Woods.
ś 133 In Architectural Woods, a contractor sued a state college to recover unpaid funds owed on a construction contract. Architectural Woods, 92 Wash.2d at 522, 598 P.2d 1372. The court concluded that, as a matter of fairness, when the State chooses to contract with a private party, courts must treat it as an equal to the other party, rather than as a sovereign. See Architectural Woods, 92 Wash.2d at 528-29, 598 P.2d 1372. But the court did not expressly limit its holding to contracts between the State and private parties. And the court's rationale is equally applicable to this case. The legislature enacted former RCW 71.24.035(15)(b) (2004) (recodified at RCW 71.24.035(17)(b)), which authorized the Department to enter into contracts with the regional support networks to provide short-term care, and the Department chose to enter into such a contract with the County. In so contracting, the Department consented to the same contractual responsibilities and liabilities as a private party, including liability for interest.
ś 134 The State impliedly waives sovereign immunity when it enters into an authorized contract, not when a court later upholds the contractual provisions. The Architectural Woods court stated: "[B]y the act of entering into an authorized contract with a private party, the State, absent a contractual provision to the contrary, thereby waives its sovereign immunity in regard to the transaction. . . ." Architectural Woods, 92 Wash.2d at 526, 598 P.2d 1372. The court focused on "the act" of contracting, not the validity of each contractual provision. And it stated that the State waives its sovereign immunity with respect to "the transaction," not each individual term. Additionally, Architectural Woods requires the legislature to authorize the State to enter into the type of contract at issue and the State to actually enter into such a contract. Architectural Woods, 92 Wash.2d at 527, 598 P.2d 1372. It does not require legislative approval of the individual terms of the contract. Here, the legislature authorized the Department to enter into contracts with the regional support networks to provide short-term mental health services, and the Department actually entered into such contracts. Architectural Woods requires no more.
ś 135 Moreover, the Department created this problem by acting in a manner that exceeded its statutory authority. It should not be allowed to benefit from this act by hiding behind the cloak of sovereign immunity. And failing to impose prejudgment interest on the State because a court has struck down a contractual provision goes against the purpose of imposing prejudgment interest. The Department wrongfully retained money that it should have paid to the County; the Department should pay the County interest on it. See Seattle-First Nat'l Bank, 94 Wash.App. at 760, 972 P.2d 1282. The trial court abused its discretion in denying prejudgment interest on the liquidated damages.
ś 136 The question of pre-judgment interest on the County's award of damages for long-term care is a different matter. The legislature did not authorize the Department to contract with the County regarding long-term care. See Former RCW 71.24.035(15)(b) (2004) (requiring the contracts to address short-term commitments, residential care, and emergency services). And, as discussed above, the contracts themselves do not address long-term care. The Department essentially forced the County to care for patients that were the Department's responsibility, a matter outside the scope of the contracts. Accordingly, the State did not *633 waive sovereign immunity with respect to the cost of long-term care and the trial court did not abuse its discretion in refusing to award the County prejudgment interest on this claim.

VIII. MOTION TO STRIKE
ś 137 The State has moved to strike from the County's reply brief all references and arguments related to (1) Exhibit 49, which was not admitted in the trial court and is not part of the record on appeal and (2) the County's claims under former RCW 71.24.300(l)(e) (2004),[28] which the County voluntarily dismissed below.
A. Exhibit 49
ś 138 We will strike portions of an appellate brief that refer to material parties did not bring to the trial court's attention. In re Dependency of K.S.C., 137 Wash.2d 918, 932, 976 P.2d 113 (1999). The County concedes that it erroneously cited to Exhibit 49 in its discussion of its Medicaid funding claim. Accordingly, we grant the State's motion to strike the County's references to this exhibit.
B. Arguments Related to Former RCW 71.24.300(1)(e)
ś 139 In its fourth amended complaint, the County claimed that the Department had violated former RCW 71.24.300(l)(e) by failing to make a portion of the funds appropriated for Western State Hospital available to the County to provide short-term evaluation and treatment services. The County later voluntarily dismissed this claim.
ś 140 The State asserts that the County's references to former RCW 71.24.300(l)(e) in its reply brief are an improper attempt to revive the claim. A careful reading of the County's brief, however, shows that it refers to this statute and its legislative history to support its argument under former RCW 71.24.300(l)(d) that short-term care provided at Western State Hospital should count toward its duty to provide 85 percent of short-term evaluation and treatment services within its boundaries. The County asserts that former RCW 71.24.300(l)(e)'s legislative history supports its arguments on this issue and refutes the State's. Moreover, because the language of former RCW 71.24.300(l)(d) is unambiguous, the discussion of RCW 71.24.300's legislative history is unnecessary to the analysis of this case. We deny the State's motion to strike these references.
C. Attorney Fees
ś 141 The State also requests attorney fees for preparing the motion to strike as sanctions under RAP 10.7. Although the County cited to an exhibit not admitted below, the error was minor and did not affect our analysis of the case. We decline to impose sanctions against the County.
ś 142 We hereby affirm the trial court's judgment and order awarding monetary damages as well as its dismissal of the Medicaid funding and 85 percent requirement claims. We reverse the trial court's denial of the motion to vacate the injunction and the denial of prejudgment interest on the liquidated damages claim, but we affirm the denial of prejudgment interest on the long-term care claim. Finally, we grant the State's motion to strike in part and deny sanctions against the County.
We concur: HUNT, J., and VAN DEREN, A.C.J.
NOTES
[1] A third state hospital, Northern State Hospital, was closed in the 1970s.
[2] This term was changed to "designated mental health professional" in 2005. LAWS OF 2005, ch. 504, § 104.
[3] The State Department of Health closed Puget Sound Behavioral Health two months after the trial in this case concluded.
[4] The County did not sign a regional support network contract for the 2007-09 biennium because of a dispute over funding. M. Alexander Otto, County Mental Health Pullout, NEWS TRIB. (TACOMA), Aug. 18, 2007, at A01. The Department began operating the County's local mental health system on January 1, 2008. M. Alexander Otto, Mental Health Bills' Drift: Don't Copy Pierce County, NEWS TRIB. (TACOMA), Jan. 28, 2008, at A1.
[5] The Department repealed WAC XXX-XXX-XXXX in 2006 in response to amendments to the Community Mental Health Services Act in which the legislature directed the regional support networks and the Department to establish an allocation of hospital beds among the networks. LAWS OF 2006, ch. 333, § 107 (codified at RCW 71.24.310); Wash. Reg. XX-XX-XXX (Aug. 31, 2006).
[6] We recognize that different populations are subject to initial 90 and 180-day commitments and that the parties' briefs focus on those eligible for 90-day commitments. Given the trial court's references to both 90 and 180-day commitments, however, we also refer to both categories of long-term commitment in our discussion of RCW 71.05.310(1).
[7] The State does not assign error to the additional finding that Puget Sound Behavioral Health is not a facility certified by the Department to provide long-term care to patients committed pursuant to RCW 71.05.320.
[8] The current version of the statute requires the regional support networks to provide within their boundaries evaluation and treatment services for at least 90 percent of persons detained or committed for periods up to 17 days, but otherwise remains substantively the same. RCW 71.24.300(6)(a), (c), (d).
[9] In addressing how the State could respond to its injunction, the trial court stated, "Maybe what you are going to do is you are going to have the legislature say long-term patients don't need to be in certified beds at Western State Hospital. Only the legislature can make that determination." RP (Jan. 6, 2006) at 31. As stated above, the legislature made no such determination in 2006.
[10] The State appears to admit in its reply brief that the contracts were ambiguous or, at best, silent on this point, as it asserts that "the real issue is whether [the parties] should have worked these matters out in the best interest of all those affected . . . or whether the trial court was justified in establishing an arbitrary time-frame for admission regardless of the parties' agreements and legislative intent. . . ." Reply Br. of Appellant at 11.
[11] The two contracts at issue permitted the County to pursue court action against the Department if other forms of dispute resolution failed.
[12] The new legislation clearly does not affect the monetary judgment, as it exempts from its coverage monetary damage claims reduced to final judgment. Laws of 2006, ch. 333, §§ 103, 301. The legislature specifically appropriated funds to pay this judgment in its supplemental budget. LAWS OF 2006, ch. 372, § 204(5)(b).
[13] Exhibit 1 covered the costs incurred from September 12, 2002, through October 18, 2005.
[14] The injunction took effect on December 9, 2005.
[15] As explained earlier, this injunctive relief would be invalid in light of the 2006 legislation were the regulation still in effect.
[16] The liquidated damages provisions were as follows:

(3) If the in-residence census exceeds the funded capacity on any day or days within the fiscal year, the MHD [Mental Health Division] Will assess liquidated damages calculated on the following formula:
(a) Only RSNs who are in excess of the individual allocated census on the day or each day of over census will be assessed liquidated damages;
(b) The amount of liquidated damages charged for each day will be the number of beds over the funded capacity of the hospital multiplied by the state hospital daily bed charge consistent with RCW 43.20B.325;
(c) The amount of liquidated damages charged to each RSN will be a percentage based on the number of beds over their allocation divided by the total number of beds over the funded capacity on the day or each day of over census;
(d) The liquidated damages will be recovered by the MHD by a deduction from the monthly payment made by the MHD two months after the end of the month in which the residence census exceeded the state bed allocation of that RSN.
Former WAC XXX-XXX-XXXX.
[17] Former WAC XXX-XXX-XXXX lists six sources of statutory authority, including RCW 71.05.560 and RCW 71.24.035(5)(c). The other four statutes are irrelevant to this appeal. See RCW 9.41.047 (authority to adopt rules regarding restoration of right to possess firearms), RCW 43.20B.020 (authority to charge fees for Department services), RCW 43.20B.335 (authority to adopt rules regarding fees for mental health treatment); former RCW 71.34.800 (2004) (recodified as RCW 71.34.380) (authority to adopt rules regarding mental health services for minors).
[18] The legislature amended this statute to add the language regarding its intent that the state hospitals operate as "clinical centers for handling the most complicated long-term care needs of patients with a primary diagnosis of mental disorder" in 2006, as part of the amendments made in response to this litigation. See LAWS OF 2006, ch. 333, § 102. Thus, this language did not exist at the time the Department promulgated former WAC XXX-XXX-XXXX. The statute did provide that the legislature intended the community mental health system to focus on maintaining mentally ill individuals in the community. Former RCW 71.24.016 (2004).
[19] This section previously read, in full:

The legislature finds that administration of chapter 71.05 RCW and this chapter can be most efficiently and effectively implemented as part of the regional support network defined in RCW 71.24.025. For this reason, the legislature intends that any enhanced program funding for implementation of chapter 71.05 RCW or this chapter, except for funds allocated for implementation of mandatory statewide programs as required by federal statute, be made available primarily to those counties participating in regional support networks.
Former RCW 71.24.310 (2004).
[20] The reimbursement rate per day is the hospital's annual budget for long-term inpatient care divided by the number of patient days of care assumed in developing the budget. RCW 71.24.310(6).
[21] The 2003-05 contract provides: "Any provision of this Agreement which conflicts with state and federal statutes, or regulations, or Centers for Medicare and Medicaid Services . . . policy guidance is hereby amended to conform to the provisions of state and federal law and regulations." Ex. 7 at 12. The 2001-03 contract contains substantially similar language.
[22] The State asserts, as a threshold matter, that the County does not have standing to challenge the contracts on the basis of alleged noncompliance with Medicaid law. Providers such as the County generally do not have enforceable rights under the Medicaid Act. See Sanchez v. Johnson, 416 F.3d 1051, 1062 (9th Cir.2005). But the County bases its claims on the contract terms requiring amendment to conform to state and federal law. The County does have standing to enforce the contract terms.
[23] The State argues that this court should treat the trial court's findings of fact as verities on appeal because the County did not assign error to specific findings. Under RAP 10.3(g), we review only issues set forth in an assigned error or clearly disclosed as an associated issue. In appropriate circumstances, we will waive technical violations of RAP 10.3(g), especially where the brief makes the nature of the challenge clear and includes the findings in the text. Harris v. Urell, 133 Wash.App. 130, 137, 135 P.3d 530 (2006), review denied, 160 Wash.2d 1012, 161 P.3d 1026 (2007). Here, the County assigned error to the trial court's "findings, conclusions and judgment. dismissing the County's claim that [the Department's] contract requirements required PCRSN to use Medicaid funds for non-Medicaid purposes," Br. of Resp't at 4, and included the trial court's findings of fact and conclusions of law and final order and judgment in appendices to its brief. The County specifically argued only that substantial evidence did not support the finding that the federal government tacitly permitted the use of Medicaid funds for non-Medicaid services. The nature of the County's challenge to this finding is clear from its assignment of error and its arguments. Accordingly, we review the County's challenge to this finding.
[24] At the time of trial, the State had submitted a plan for this fund and was in negotiations with the center over how to implement it.
[25] The 2001-03 contract required the County to:

Ensure that all funds, including interest earned, provided pursuant to this Agreement are used to support the public mental health system. Savings generated under the capitation rate may be used to provide innovative and needed. services beyond those described in this Agreement so long as the [County] does not exceed the funding amount authorized by the legislature, and is within their upper payment limit.
Ex. 6, at 29. The 2003-05 contract contained a substantially similar requirement.
[26] The legislature recodified this statute to former RCW 71.24.300(l)(c) in 2005. LAWS OF 2005, ch. 503, § 11. In 2006, the legislature again recodified the statute and increased the requirement; regional support networks are now responsible for providing at least 90 percent of short-term evaluation and treatment services within their boundaries. LAWS OF 2006, ch. 333, § 106 (codified at RCW 71.24.300(6)(c)).
[27] Spokane County includes Eastern State Hospital within its boundaries. RCW 72.23.020.
[28] This statute, which required the regional support networks to "administer a portion" of the funds appropriated for the state hospitals, was recodified in 2005 to former RCW 71.24.300(l)(d). LAWS OF 2005, ch. 503, § 11. At the same time, the 85 percent requirement, which had been codified at RCW 71.24.300(l)(d), was recodified to former RCW 71.24.300(1)(c). LAWS OF 2005, ch. 503, § 11. In 2006, the legislature repealed the "administer a portion" requirement and recodified the 85 percent requirement to RCW 71.24.300(6)(c), increasing the requirement to 90 percent. LAWS OF 2006, ch. 333, § 106. At the time the County filed its lawsuit, the "administer a portion" requirement was codified at former RCW 71.24.300(l)(e) and the 85 percent requirement was codified at former RCW 71.24.300(l)(d). Although the State refers to the "administer a portion" statute as former RCW 71.24.300(l)(d) in its motion to strike, we refer to it here as former RCW 71.24.300(l)(e), which was its designation at the time the County filed its lawsuit.